JAMES LUM, M.D., Appellant, *v.* WILLIAM STINNETT, Respondent.

No. 6220

September 3, 1971            488 P.2d 347

*Austin & Thorndal,* of Las Vegas, for Appellant.

*Singleton, Beckley, DeLanoy, Jemison & Reid, Chartered,* of Las Vegas, for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

This appeal arises from a malpractice action commenced by respondent against three physicians: Dr. Greene, who attended respondent at a hospital emergency room; Dr. Romeo, respondent's "family doctor," who consulted with Greene by telephone, directed that respondent be X-rayed, and thereafter attended him; and appellant Lum, who "read" the X-rays. Respondent's theory was that defendants negligently failed to detect and treat a compression fracture in respondent's spine. Issues dispositive of this appeal concern the propriety and effect of an agreement by which respondent and insurance carriers for Greene and Romeo "settled" their disputes, throwing all responsibility for a $50,000 verdict on appellant Lum.

All parties announced ready for trial on October 29, 1969, and jury selection continued through the morning of October 30; counsel for Greene and Romeo took a major part in choosing the jury, jurors being selected whom appellant's counsel might well have rejected had he known his apparent allies were then negotiating a "settlement" with respondent. By a letter hand-delivered to counsel for Greene and Romeo on October 29, respondent's counsel, with some self-serving recitals, proposed: (1) if the jury awarded nothing or less than $20,000, the insurance carriers for Greene and Romeo were to pay the sum necessary to bring recovery to $20,000; (2) if the verdict exceeded $20,000, respondent would not execute against Greene and Romeo; and (3) respondent would not oppose a motion for directed verdict in favor of Greene and Romeo.[1]

---

[1] Melded into the proposal were at least these self-serving recitals: (a) appellant's insurance carrier had taken an "irresponsible position"; (b) this was why respondent would deal separately concerning Greene and Romeo; (c) respondent's counsel believed Greene and Romeo negligent;

On October 30, when jury selection was completed, counsel for Greene and Romeo told appellant's counsel something of this proposal, and that they had decided to accept it. By letter of October 31, counsel for Greene and Romeo did advise respondent's counsel they accepted the proposal, if respondent's counsel agreed not to "oppose a motion made pursuant to N. R. C. P. 41(b) or N. R. C. P. 50(a) at the close of plaintiff's case," to "press forth actively against Dr. Lum," not to settle with him for less than $20,000 without their written consent, and to urge a jury verdict in excess of $20,000. Respondent's counsel approved and signed this counter-proposal.

On November 3, when court reconvened to begin trial, appellant's counsel moved to withdraw and asked a continuance because he could not agree with appellant's insurance carrier on how to meet problems the "settlement" posed to his defense. The motion being denied, a trial ensued, noteworthy aspects of which were as follows.

First, while Romeo seemed the prime target of respondent's Complaint, respondent's counsel focused on appellant in his opening statement to the jury, displaying apparent candor regarding Greene and Romeo.[2] Greene's counsel then announced he would reserve his opening statement; thus, appellant's counsel could do the same, or hazard being left no way to meet opening statements made later by counsel for the "co-defendants."

Thereafter, though now furthering the interests of Greene, Romeo, and their insurance carriers, respondent's counsel called Greene as an "adverse party," and then opposed full cross-examination by appellant's counsel on the ground his own interrogation was "cross-examination"; he defeated an objection that he was leading Romeo by contending Romeo was an "adverse witness," and led him at will. When respondent's counsel omitted to ask respondent's former employer if

(d) nonetheless, they "recognize[d] that the greater share of responsibility is upon Dr. Lum," and believed him 80% to blame; (e) respondent's damages were approximately $100,000; (f) accordingly, respondent was willing to settle concerning Greene and Romeo for $20,000; (g) a smaller verdict was no more than a "remote possibility."

[2]"Now, defendant Romeo is a general practitioner and he will testify that he relied upon the x-rays, or the x-ray report of Dr. Lum.

"Now, picture, if you will, we have defendant Greene, who was in here under a limited license, treating people only in the emergency room under the direction of Dr. Romeo. We have Dr. Romeo, who is a general practitioner, who, in turn, is relying on the person who is the expert on radiographic study, Dr. Lum."

respondent had received "tips" as well as wages, Greene's counsel went into this item of special damage on "cross-examination," in a notable departure from his usual nonchalance. In contrast to the placid role played by counsel for appellant's "co-defendants," his own counsel's efforts must have suggested only appellant had cause for concern. This inference can only have been strengthened when, at the close of respondent's case, the court granted 41(b) motions for dismissal of Greene and Romeo, without opposition by respondent's counsel, but over appellant's objection that he would be prejudiced if not similarly dismissed. Appellant's 41(b) motion for dismissal was denied.

Appellant's counsel then moved for a mistrial, on grounds that the dismissal of Greene and Romeo would "prejudice Defendant Lum in the eyes of the jury," that the jury would infer they were free from negligence while he was not, and that "the overall prejudicial effect of these circumstances cannot be overcome by any instructions or admonitions to the jury." Respondent's counsel countered, saying: "if this court desires and if he desires to put the agreement in before the jury, I think that that would probably be all right. If he desire to put in the agreement, the written agreement into the jury." After further colloquy, the court required copies of the agreement for the court and appellant's counsel; then, it denied the motion for mistrial, without determining whether, or how, the jury might be informed of the agreement.[3]

By this time, having already called Greene and Romeo as "adverse witnesses," respondent had the benefit of their testimony without being bound by it. By logical extension of the trial court's rulings, if appellant recalled them now, they would be his witnesses, particularly since they now were not parties. Appellant's counsel tried another approach.

Uncontroverted testimony supporting appellant's motion for a new trial shows before closing his case, appellant's counsel asked that counsel approach the bench. He was, he told the court, prepared to call a witness to prove the terms of the agreement, and inquired how the problem was to be handled. (Perhaps recognizing dangers inherent in calling Greene or Romeo, he testified he had decided to call respondent's counsel, or counsel for Greene or Romeo.) The court told him "the

---

[3]Testimony at the hearing of appellant's Motion for New Trial is conflicting on whether appellant's counsel had seen any part of the agreement before. Counsel for the "co-defendants" say they showed him respondent's original proposal of October 29, after jury selection ended October 30; appellant's trial counsel says they only told him about it, and the record suggests he did not know all its terms.

matter would be handled by jury instructions," and it does not appear respondent's counsel manifested opposition to this.

However, the record reflects when appellant's counsel submitted an instruction on the subject, and reminded the court it had said the matter would be handled by instructions, respondent's counsel said, "it is our position that if he desired to show that there was an agreement in existence that the best evidence would be the agreement itself." Without indicating what instruction it had intended to give, the court refused the one offered by appellant, saying Greene and Romeo were dismissed by the court pursuant to Rule 41(b). Naturally, since Greene and Romeo had been thus dismissed, no verdict forms regarding them were provided the jury, nor could any special instructions regarding their possible liability be expected. The jury was, in effect, asked to decide if appellant was negligent, or no one was.

On final argument to the jury, respondent's counsel did not suggest that Greene or Romeo were in the least negligent, although counsel's letter of October 29 recited the belief this was so. Nor did counsel suggest the verdict be diminished 20 percent, or any amount, so appellant would not have to pay for the negligence of Greene and Romeo. Of them he said, "they both are no longer in the case," and proceeded to rely on their testimony. He even suggested Romeo's apparent respect for one of respondent's other witnesses was reason to credit the latter.[4]

The jury returned a verdict for $50,000; judgment was entered for the amount of the verdict plus costs; appellant moved for judgment notwithstanding the verdict or alternatively for a new trial; the court denied this motion; hence, this appeal.

1. First, we perceive that strangers to the action, insurance carriers for Greene and Romeo (themselves strangers to claims against appellant), promised to pay $20,000 if respondent would prosecute his action against appellant, and not settle without consent for less than $20,000. Such an agreement is

---

[4]In regard to this, counsel said:

"Now it's interesting to note that Dr. Romeo, one of the general practitioners in this area, an active one, I might say, thought enough of Dr. Waters and his reputation and ability as an orthopedic surgeon to send William Stinnett to him."

He also said:

"I—the reason I say this was such a hard case, we had to rely on my ability to ferret out the truth on cross-examination of the witnesses for the defense; and I don't know whether I've done my job adequately or not, ladies and gentlemen of the jury."

the very definition of the common law offense of maintenance. "Maintenance exists when a person without interest in a suit officiously intermeddles therein by assisting either party with money or otherwise to prosecute or defend it." 14 C.J.S., Champerty and Maintenance, § 1(b). In addition, the insurance carriers were to profit from any recovery against appellant; for while they "settled" their liability at $20,000, any verdict against appellant was to reduce their obligation. "Champerty is maintenance with the additional feature of an agreement for the payment of compensation or personal profit from the subject matter of the suit." 14 C.J.S., Champerty and Maintenance, § 2.

Our own decisions establish: "To maintain the suit of another is now, and always has been, held to be unlawful, unless the person maintaining has some interest in the subject of the suit, or unless he is connected with the assignor by ties of consanguinity or affinity." Cf. Gruber v. Baker, 20 Nev. 453, 469, 23 P. 858, 862 (1890). If insurance companies may contend, and they do, that they have so little relationship to actions against their insureds that the policies they issue are not discoverable even by vitally concerned plaintiffs, cf. Washoe Co. Bd. Sch. Tr. v. Pirhala, 84 Nev. 1, 435 P.2d 756 (1968), then surely no one will contend a carrier has such relationship to a plaintiff's action as justifies fostering it, for profit, against defendants with whom the carrier and its insureds have no relationship whatever.

Next, we perceive the insurance companies were to become the parties truly interested in the action, to the extent of $20,-000, with right to refuse its being settled for less. This brings attention to a variant of the consideration first mentioned. Under a rule like our NRCP 17(a), discussing a somewhat similar "settlement agreement," another court has said:

"F. R. C. P. 17(a) states that '[e]very action shall be prosecuted in the name of the real party in interest.' This has been defined as the person who 'by the substantive law has the right to be enforced.' 3 Moore's Federal Practice, par. 17.02 at page 1305 (2nd ed. 1964). The purpose behind this requirement is to protect individuals from the harassment of suits by persons who do not have the power to make final and binding decisions concerning prosecution, compromise and settlement. . . . Under Pennsylvania law, the attempted assignment from Kenrich to Jerome Kline is void as champertous and against

public policy, and vested no rights in Kline sufficient to maintain this cause of action." Kenrich Corporation v. Miller, 256 F.Supp. 15, 17–18 (E.D. Penn. 1966).

We deem agreements whereby insurance carriers agree to any pay consideration to foster litigation in which they are not interested, in order to avoid their own liabilities, contrary to law and public policy.[5]

2. Considering propriety of certain "settlement agreements" calling for defense counsel to participate in litigation

[5]Klotz v. Lee, 114 A.2d 746 (N.J. Super. 1955), one of two decisions upon which respondent relies, is no authority to the contrary, because that case involved an essentially different type of agreement. A comparison to the one before us is instructive.

". . . The arrangement was, in substance, that if the jury returned a verdict, and regardless of its form, the company would pay plaintiff and the latter would accept the sum of $12,500 in full settlement and satisfaction of his claim against Lee [settling defendant], subject to the understanding that if the verdict was against both Lee and Breish [co-defendant] plaintiff would not exact more than 50% of the verdict from Breish or his insurance carrier. Nothing was paid pursuant to this agreement until after the trial. Thereupon Lee's insurance company did pay plaintiff $12,500 and the trial court consequently reduced the $35,000 verdict returned in favor of plaintiff and against the Breishes by that amount." Id., at 749.

Lee had a cross claim against the Breishes for personal injuries and damage to his car; the Breishes had a cross claim against Lee for damages to the Breish car; thus, if Lee did so, Lee had a legitimate interest in advocating Breish was negligent.

It is apparent neither Lee nor his insurance carrier received any right to benefit from a judgment by the plaintiff against Breish, save an equitable one that Lee should pay no more than half of any judgment against both Lee and Breish.

It is equally apparent that, because Lee might be compelled to pay half of a judgment against both (subject to a limitation of $12,500), he remained somewhat interested in holding the amount of such a judgment below $25,000. For example, if the jury had returned a judgment of $20,000 against both, Lee would only have paid $10,000, rather than $12,500.

Breish, not Lee's insurance carrier, benefited when the jury returned a verdict only against Breish; for the carrier paid plaintiff $12,500 under the agreement, and the court consequently reduced the $35,000 verdict against Breish by that amount.

Manifestly, the agreement was neither champertous, nor did it tend, under the circumstances of the case, to encourage sham litigation. The case was appealed to the New Jersey Supreme Court, Klotz v. Lee, 121 A.2d 369 (N.J. 1956), and that court pointed out Lee retained an adversary position, which he presented with "no diminution in the vigor." Id., at 372.

when they were actually interested in furthering the plaintiff's cause, the Arizona State Bar Committee on Rules of Professional Conduct concluded the same contravened policy of Canons of Professional Conduct concerned with representing conflicting interests, candor and fairness, taking technical advantage of opposing counsel, and unjustifiable litigation.[6] The Committee said:

"Drinker's text on 'Legal Ethics,' at page 75, cites New York and other judicial and ethical rulings in support of his statements that:

'A lawyer may not, in order to get decided a question of law in which he is interested, foist a fictitious controversy on the court;' and, again: 'He may not * * * ostensibly appear for a stooge client when he really represents others.'

"These statements are not direct parallels, but they express a clear intent, with respect to the canons cited, that *trials and legal proceedings shall be honest, shall call forth the best possible legal abilities of the lawyer on behalf of his client, and shall be directed to the achievement of justice.*" Op. No. 70–18, Ariz. State Bar Committee on Rules of Prof. Conduct (1970); emphasis is in original.

Manifestly, in view of these considerations, the champertous agreement between respondent and the insurance carriers for Greene and Romeo called for improper conduct on the part of all attorneys concerned; and while we recognize they became involved only out of devotion to their clients, the agreement

---

[6]The agreements under consideration were:

"A. An agreement in the nature of a covenant not to execute whereby the insurance company for A and B would pay plaintiff $10,000.00 prior to trial, and plaintiff would agree not to execute on any assets of A and B for any judgment against A and B in excess of $10,000.00[.] Counsel would also agree that these defendants would participate actively in the trial. The jury would not be informed of the agreement and the court and other defense counsel may not be informed thereof prior to verdict; or

"B. An agreement that A and B would participate fully in the trial and, in the event of a judgment against all defendants, execution would be levied only against the officer and his employer, execution not being issued against A and B's insurance company, or against A and B's private property, unless the insurance limitation for the other defendants should fail to satisfy the judgment. The other defendants and the court may not be advised of such agreement."

nonetheless contravened policy expressed in the Rules of Professional Conduct, SCR 163 et seq.[7]

Respondent's counsel contend everything they did was "open and aboveboard," and we are sure they did not perceive the essential impropriety of the agreement. Yet they cannot, we think, suggest they did not bargain for and utilize its inherent advantages, which we find inimical to true adversary process. If they wanted no more than a fair trial against appellant Lum, why was the agreement framed to retain Greene and Romeo as sham "adverse parties" in the case? It is no answer to say appellant was not stabbed in the back. If his hands were tied, it matters little that he could see the blow coming.

Respondent suggests appellant was free to bring the agreement into the open, e.g. through examination of Greene and Romeo. On interrogation by this court during oral argument, respondent's counsel acknowledged the agreement itself might prejudice the jury, since it contains references to respondent's damages, and to appellant's liability, his insurance, and his insurance carrier's "irresponsible position." Counsel met this dilemma by telling us appellant might have asked the trial court to excise these prejudicial portions of the agreement; yet counsel conceded this request would have been met by an objection based on the "best evidence rule," as was appellant's attempt to obtain an instruction on the subject. Back to his dilemma, counsel suggested to us a "best evidence" objection to use of an edited copy of such an agreement probably is unsound. Thus, we think, the sum of counsel's argument is that nimbler opposing counsel and an alert trial judge might have defeated his plan.

With this we are not concerned; nor are we at all sure it is so. If appellant's counsel had undertaken to examine Greene and Romeo on an edited text of the agreement, could he be

[7]Ponderosa Timber & Clearing Co. v. Emrich, 86 Nev. 625, 472 P.2d 358 (1970), the other case on which respondent relies, is not authority to the contrary. There we expressly pointed out that the validity of the agreement was not before us, because the lower court had set it aside on other grounds, and that court order had not been challenged. See: n. 1, 86 Nev., at 627; 472 P.2d, at 360. Furthermore, a judgment had been entered against the co-defendants, as well as the appellants; the lower court ordered a new trial, unless the plaintiff filed a disclaimer for half the judgment, and the disclaimer was filed; thus, any intention to throw the entire liability of the judgment on appellants had been defeated when this court reviewed the case. On the record before it, a majority of this court decided the appellants were not prejudiced by a judgment for the balance.

sure its prejudicial aspects would not be revealed to the jury by their answers? Further, had its bare terms been laid before the jury, how would this have affected their treatment of appellant? Might they not then be more casual about awarding at least some recovery against appellant, knowing Greene and Romeo must pay the difference up to $20,000? Might they not infer, even from the agreement's bare terms, that the others considered appellant the intransigent wrongdoer, and let this affect their verdict against him? Might knowledge a minimum value of $20,000 had been placed on respondent's injuries affect their deliberations? We do not know; we know only that appellant had the right to litigate his case without hazarding the prospect that such considerations might affect the jury's verdict.

Respondent contends no prejudice is shown because the "co-defendants" testified substantially as in their depositions; appellant suggests there were material differences. If respondent be correct, we still could not determine the trial testimony would not have been different absent the agreement, or its impact different if not supposedly elicited from "adverse parties." Further, if we could make these determinations, this still would not meet appellant's basic contention that, by other irregularities proceeding from the agreement, the trial was deprived its proper adversary character.

It is sufficient to see from the record, as we do, that such irregularities so warped presentation of the case as to deny a fair trial, that the record contains nothing amounting to a waiver, and that the question has been preserved for our review. As mentioned, appellant's counsel repeatedly sought the trial court's protection, showing no disposition to gamble on the verdict and later complain. Most of these attempts are involved in appellant's assignments of error, but we need not consider the specifics of all of them. We see no waiver; the gravamen of the problem was lucidly presented by appellant's motion for new trial; the court erred in denying that motion.

Because the lower court made no express determination that there was "no just reason for delay," its dismissal as to Greene and Romeo was perhaps erroneous for this reason alone, and certainly not final. NRCP 54(b); Donoghue v. Rosepiler, 83 Nev. 251, 427 P.2d 956 (1967); Wilmurth v. State, 79 Nev. 490, 387 P.2d 251 (1963). Because respondent's agreement with the carriers for Greene and Romeo is void, in order to place all parties in their original position as nearly as may be,

we order that on remand the action shall stand reinstated against Greene and Romeo, as well as appellant.

We withhold determination of other issues relating to the sufficiency of the evidence and propriety of instructions, first, because some might affect Greene and Romeo who are not before us, and second, upon a proper new trial, the issues and evidence might well be different.

The cause is reversed and remanded.

ZENOFF, C. J., BATJER, MOWBRAY, and THOMPSON, JJ., concur.