Vernon Duane **DANIEL**

v.

**PENROD DRILLING COMPANY** et al.

Civ. A. No. 73-3273.

United States District Court,
E. D. Louisiana.

Feb. 18, 1975.

William J. Mora, III, Metairie, La., John R. Martzell, New Orleans, La., for plaintiff.

Lloyd C. Melancon, New Orleans, La., for Chevron Oil Co.

William W. Miles, James L. Donovan, New Orleans, La., for Popich Bros. Water Transport, Inc., Chevron Oil and Reserve Ins. Co.

Marshall Ballard III, Lawrence E. Abbott, New Orleans, La., for Penrod Drilling Co.

A. R. Christovich, Jr., New Orleans, La., for Uniguard Ins. Co.

ALVIN B. RUBIN, District Judge:

By motion for mistrial, one of the defendants in a jury trial raises the issue whether an agreement between the plaintiff and a co-defendant, not revealed to the jury or the moving defendant, to dismiss the co-defendant at the end of the trial, in exchange for the co-defendant's agreement to offer no resistance to the plaintiff's case, warrants a new trial.

Vernon Daniel, a Jones Act employee of Penrod, sued his employer for injuries sustained aboard a crew boat while en route to an offshore location. Penrod had contracted to perform offshore services for Chevron. Chevron was obliged to furnish transportation to the job site for Penrod's employees. Chevron contracted with Popich Bros. to provide the transportation. So Daniel also sued Popich under the general maritime law for negligence in dispatching and operating the crewboat, and Chevron for negligence in dispatching it in unsuitable weather. Chevron's defense was assumed by Popich Bros. Penrod claimed indemnity from Popich and Chevron including attorney's fees and costs. Various problems in trial preparations were encountered, partly as a result of substitution of different trial counsel for Popich Bros. However, the defendants had conferred about strategy and had participated jointly in settlement negotiations.

During a conference among counsel for both defendants, two days preceding trial, Penrod's counsel stated that he believed Popich Bros. was the primary target defendant, and that Penrod's exposure was only to the possible determination that it was guilty of technical or passive fault, by virtue of its obligation to provide safe transportation to and from the job site. At that conference, Penrod's counsel stated he had not yet decided what strategy to pursue during trial—he could attack only the plaintiff's case, primarily with respect to plaintiff's contributory/comparative negligence as well as what he thought were exaggerated damages; he could attack only the co-defendants, Popich and Chevron; he could attack no one and main-

tain as low a profile as possible during trial; or, lastly, he could attack every other party in the lawsuit.

Penrod's counsel suggested to Popich's attorneys that Popich go first in the cross-examination of plaintiff's witnesses as well as in the presentation of their own case, because, if he were forced to proceed first,[1] he would have no choice but to attack everyone, not knowing what Popich's counsel would do behind him. Popich's counsel agreed to this.

Trial to a jury began on September 23, 1974. At the noon recess on the first day of trial, plaintiff's counsel approached Penrod's counsel and offered to dismiss Penrod from the lawsuit with prejudice at the conclusion of the evidence if Penrod "would agree", to quote Penrod, "not to maintain an aggressive, destructive posture vis-a-vis plaintiff's case, its witnesses, etc." This was the first time the subject was mentioned. Penrod's lawyer immediately telephoned his law offices, spoke with one of his partners who personally represents Penrod, relayed the offer, and requested that he come down to the courtroom so that the matter could be fully discussed.

The older partner came to court and fully discussed the matter with trial counsel sotto voce in court as the trial progressed. The older partner then spoke with plaintiff's counsel during the first afternoon recess, and confirmed that the non-suit would be with prejudice. Thereafter, the older lawyer telephoned Penrod's office and the office of its insurer to explain this development, and to seek authority to enter into the agreement.

Meanwhile, during the noon recess, plaintiff's counsel mentioned to the court that he planned to dismiss Penrod at the conclusion of the trial. At the end of the first day of trial, a settlement conference was conducted in the court's chambers. At that time, Penrod's counsel still had the settlement authority he had possessed on the eve of trial, and was willing to contribute that amount, namely $10,000.00, to a full settlement of the matter. At the commencement of the settlement conference, Penrod's counsel and plaintiff's counsel consulted privately, and it was the court's impression, as the conference progressed and the settlement offer was made by Penrod, that their agreement had been set aside.

Penrod's counsel states that their agreement was still in force; despite the agreement with plaintiff's counsel, Penrod was still willing to contribute this sum because it was still faced with the expense of three to four days of trial, and there remained the possibility of an appeal. However, the settlement negotiations were unsuccessful.

The trial of the case continued into its second day on Tuesday, September 24. The testimony of the Captain of the Popich vessel was taken, and this was damaging to Popich. That evening the Court learned that the Daniel-Popich deal was still on.

Just before the case went to the jury, plaintiff's counsel formally advised the Court and Popich's lawyers of the agreement, and moved to dismiss Penrod. The Court stated that it would withdraw the Penrod issues from the jury but it withheld action on the motion to dismiss Penrod. At this juncture, plaintiff's counsel offered to testify before the jury and explain what had happened. The Court denied the motion to do so, since the case had proceeded on an entirely different basis, none of the lawyers had prepared for the issues that might be raised by this testimony nor looked into the jurisprudence with regard to it, nor prepared suggested instructions for the jury.

Thereafter, the jury deliberated, and returned a verdict against Popich. Popich filed this motion.

---

1. Because Penrod was first named in the complaint, normal procedure would be for Penrod to proceed first in these matters.

The court is satisfied that plaintiff's counsel acted in what he perceived to be his client's best interest. Plaintiff's counsel states that, as he prepared for trial, he saw that his only claim against Penrod rested on the imputed negligence of Popich, and this involved an effort to extend prior jurisprudence under the Jones Act which the court might or might not have approved. This would also have created an appealable issue. The opening statements indicated that there was only a narrow issue between Daniel and Penrod. There was no other motive, therefore, than trial strategy in proposing the agreement. He had no intention of deceiving the Court or the jury. But in fact the jury was not informed of the true posture of the parties. It perceived the case as originally presented to it: a contest in which the plaintiff was asserting a claim against both defendants, and in which each defendant was resisting vigorously. Once the deal had been struck, the conduct of counsel for both the plaintiff and Penrod could hardly be completely uninfluenced by the true state of affairs; they had no adverse interest, Penrod would not be cast, and only Popich had a real risk of loss.

■■ The first consideration before the Court is the integrity of the trial process. While lawyers owe a duty to their clients, they owe a primary duty to the administration of justice. They profess to be, and they are, officers of the court. If it is their duty to their clients to wage a vigorous struggle, it is their duty also not to dissimulate.

If we turn to the narrower question of legal authority on the point at issue, we find little to guide the Court's steps here. But some help can be found in cases that have considered situations indirectly analogous.

The validity of the so-called "Mary Carter agreement" has been considered by a number of courts. In substance this is a secret settlement between a plaintiff and one of the several defendants. The decision in Booth v. Mary Carter Paint Co., Fla.App. 1967, 202 So.2d 8, the case that gives the agreement its name, upheld the validity of a secret agreement under which one of the several co-defendants agreed with the plaintiff that its maximum liability would be a stated sum and, if a judgment against the other co-defendants exceeded a stated larger sum, the parties to the secret agreement might escape without any payment.

Later, however, in Ward v. Ochoa, Fla.1973, 284 So.2d 385, the Florida Supreme Court again addressed the validity of the Mary Carter agreement, which it defined as a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to trial, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants. Secrecy is the essence of such an agreement: if the trier of the fact learned of it, the fact trier would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. 284 So. 2d at 387.

In *Ward* the non-agreeing defendants, suspecting the existence of a Mary Carter arrangement between plaintiff and their co-defendants, filed a pre-trial motion to produce the agreement, which was denied by the trial court. The non-agreeing defendants appealed a verdict for plaintiff, and the Florida Supreme Court reversed, holding,

> [T]he search for truth, in order to give justice to the litigants, is the primary duty of the courts. Secret agreements between plaintiffs and one or more of several multiple defendants can tend to mislead judges and juries, and border on collusion. To prevent such deception, we are compelled to hold that such agreements must be produced for examination before trial, when sought to be discovered under appropriate rules of procedure. If the agreement shows that the signing defendant will have his maximum liability reduced by increasing the liability

of one or more co-defendants, such agreement should be admitted into evidence at trial upon the request of any other defendant who may stand to lose as a result of such agreement. 284 So.2d at 387.

In Lum v. Stinnett, Nev.1971, 87 Nev. 402, 488 P.2d 347, the Nevada Supreme Court went further; it reversed a verdict for plaintiff where plaintiff and co-defendants had executed a Mary Carter agreement shortly after the start of trial. Although plaintiff offered to tell the jury the terms of the agreement, the jury was in fact never told. The court in reversing held that the agreement violated public policy, was prejudicial to the non-agreeing defendant, and "inimical to true adversary process." 488 P.2d at 352. Furthermore, the agreement "called for improper conduct on the part of all attorneys concerned; and . . . contravened policy expressed in the Rules of Professional Conduct, S. C.R. 163 et seq." 488 P.2d at 352.

The court rejected the plaintiff's contention that any prejudice was cured by plaintiff's willingness to reveal the terms of the agreement to the jury. Knowledge of the agreement might in itself prejudice the defendant's case since the jurors might infer that all parties to the agreement believed that the non-agreeing defendant was the party really at fault. The court did not know what effect such knowledge might have on the jury, but "we know only that appellant had the right to litigate his case without hazarding the prospect that such considerations might affect the jury's verdict."

The court also rejected the plaintiff's argument that there was no prejudice since the co-defendants testified substantially as they did in their depositions; the court said "we still could not determine the trial testimony would not have been different absent the agreement, or its impact different if not supposedly elicited from 'adverse parties.' " 482 P.2d at 353. Even if no specific prejudice was shown, "this still would

not meet appellant's basic contention that, by other irregularities proceeding from the agreement, the trial was deprived of its proper adversary character." Ibid.

It is unnecessary to multiply further instances, but a result inimical to Mary Carter agreements was also reached in Degen v. Bayman, S.D.1972, 86 S.D. 598, 200 N.W.2d 134. And such agreements were criticized in Pellett v. Sonotone Corp., Cal.1945, 26 Cal.2d 705, 160 P.2d 783. Compare City of Glendale v. Bradshaw, 1972, 16 Ariz.App. 348, 493 P.2d 515, where the agreement was revealed to the non-agreeing defendant prior to the beginning of trial.

█ Here the agreement between Daniel and Penrod did not go as far as the arrangement in the typical Mary Carter contract. But the agreement did make the parties' ostensible posture as disclosed to the jury a mere stratagem. Behind the scenes, their real interests were different. At least to some extent, the Daniel-Penrod agreement made Penrod's interests even more adverse to those of Popich and Chevron than appeared, since a jury finding that Popich and Chevron were negligent would benefit Penrod in its indemnity claim for attorneys' fees and costs. Since Penrod's only viable indemnity claim was based on an active-passive negligence theory, Penrod's indemnity claim would have been defeated unless the jury found that Popich and Chevron were negligent.

█ The arguments in support of the agreements in Ward v. Ochoa, *supra*, were all, in effect, the same as the arguments offered here. The reasons for their rejection are sound. Courts are not merely arenas where games of counsel's skill are played. Even in football we do not tolerate point shaving. It is perhaps because the trial is adversary that each side is expected to give its best, without secret equivocation. Counsel have no duty to seek ultimate truth in a system where the lawyer's duty is primarily to represent his client. But

even if the lawyer has no duty to disclose the whole truth, he does have a duty not to deceive the trier of fact, an obligation not to hide the real facts behind a facade. Compare Kiefel v. Las Vegas Hacienda, Inc., N.D.Ill. 1966, 39 F.R.D. 592, where the court granted the plaintiff a new trial due to objectionable trial strategy on the part of the defendant's counsel.

Nor was the vice in the agreement eliminated by the last minute offer to disclose it to the jury. Popich should not have been placed in the position of having to decide on the morning of the last day of trial how to deal with the secret agreement, or how to mitigate its impact on the jury.

The trial judge should not hesitate to set aside a jury verdict and grant a new trial in any case where the ends of justice so require. Aetna Casualty v. Yeatts, 4 Cir. 1943, 122 F.2d 350, 354. Accordingly, the motion for a new trial is granted.