Ronnie Gene BASS

v.

PHOENIX SEADRILL/78, LTD., et al.

Civ. A. No. B–80–812–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

April 26, 1983.

Crawford Parker, Parker & McPherson, Carthage, Tex., for plaintiff.

Hubert Oxford, III, Benckenstein, McNicholas, Oxford, Radford, Johnson & Nathan, Beaumont, Tex., for defendant Phoenix Seadrill 78/Ltd., et al.

Tom L. Hanna, Arthur R. Almquist, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for defendant Crown Rig Building Services, Inc.

John D. Gilpin, Gilpin, Maynard, Parsons, Pohl & Bennett, Houston, Tex., for defendant Branham Industries, Inc.

## MEMORANDUM OPINION AND FINAL JUDGMENT

JOE J. FISHER, District Judge.

On May 5, 1980, the twenty-five year old plaintiff was injured while working as a roughneck in the Gulf of Mexico aboard his employer's drilling vessel, BIG FOOT I. A forty two pound ratchet jack handle fell some 85 feet and struck Ronnie Bass in the head. The handle shattered his hard hat and crushed the back of his skull.

Bass sued his employer, Phoenix Seadrill/78, Ltd. and its general partner, Phoenix Management Corp., ("Phoenix"), under the Jones Act, 46 U.S.C. 688 (1976) and the General Maritime Law. Phoenix owned and operated BIG FOOT I.

Phoenix joined as third party defendants Branham Industries ("Branham"), the designer and fabricator of the rig, as well as the rig's erector, Crown Rig Building Services, Inc. ("Crown Rig"). Phoenix had contracted separately with both Branham and Crown Rig to have the drilling rig fabricated and installed on its vessel. Bass thereafter amended his complaint to include the third-party defendants under theories of negligence and products liability.

The case was properly before the court under Admiralty jurisdiction, 28 U.S.C. 1333 (1976). The court heard the trial without a jury. Having reviewed the record, the exhibits, and the briefs filed by the parties, the court enters this memorandum order and final judgment.

## I. FACTS

Phoenix contracted with Branham to design and fabricate drilling rigs for erection on each of two hulls that Phoenix owned. Phoenix provided the general plans and specifications for the rigs to Branham. Branham prepared its own shop drawings and details, and proceeded to fabricate the derricks.

Phoenix contracted with Crown Rig to erect the Branham-fabricated derricks aboard the Phoenix vessels, BIG FOOT I and BIG FOOT II. Crown Rig finished erecting the derrick aboard BIG FOOT I at the beginning of May, 1980. The vessel was soon towed out to sea and drilling operations were begun.

While working on the drilling floor on the vessel's fifth night at sea, Bass was struck by the falling object. The heavy steel bar split Bass' hard hat like an axe going through a melon. The blow caved in his skull, making a gash several inches long. The tool pusher summoned a helicopter to take Bass to a hospital while crewmen administered first aid. Bass was flown to a hospital in Lafayette where his life was saved and his skull repaired.

■ BIG FOOT I is a "vessel" for purposes of the Jones Act, as the coverage of the Act extends to such "special purpose structures" used by the offshore oil drilling industry. *Smith v. Pan Air Corp.,* 684 F.2d 1102, 1113 (5th Cir.1982).

■ Inasmuch as Bass was employed by Phoenix as a permanently assigned member of the BIG FOOT I crew, and his work directly advanced the mission of the vessel, Bass qualifies as a "seaman" entitled to relief under the Jones Act. *See e.g., Dove v. Belcher Oil Co.,* 686 F.2d 329, 333 (5th Cir.1982); *Offshore Co. v. Robison,* 266 F.2d 769, 779 (5th Cir.1959).

■ Bass seeks recovery from both Branham, as fabricator of the rig, and Crown Rig, as its erector, on a theory of products liability. He alleged that the monkey board assembly, as designed and fabricated by Branham, and as installed by Crown Rig, was a defective product, unreasonably dangerous to the users of the drilling rig. The products liability claim was properly before this court by virtue of the General Maritime Law. *Lewis v. Timco, Inc.,* 697 F.2d 1252 (5th Cir.1983).

## II. WHY THE HANDLE FELL

An investigation by Phoenix employees determined that a ratchet handle had fallen from the "monkey board" located some 85 feet above the drilling floor. The handle was used as a lever to move the monkey board—a platform high in the derrick on which workmen stand while racking drill pipe—back and forth between the opposite pipe racks.

The ratchet handle is a bent steel bar, about an inch thick by two and a half inches wide and some three or four feet long. It weighs over forty pounds. The handle pivoted upon a steel pin about one inch in diameter. That pin, the ratchet pin, was to have been secured in place by a ⅛″ by two inch cotter pin, according to the Branham design.

Although the Phoenix crewmen theorized that the cotter pin was either never installed or improperly installed, it is impossible to determine from the evidence which was the case. The cotter pin was never found. The ratchet pin was found, however, and the ratchet handle was reinstalled after the accident. The tool pusher secured the pin with a nut and bolt and attached a safety chain to the ratchet handle itself, shackling it around a support rail.

When informed of the falling handle, the tool pusher aboard BIG FOOT I's sister ship climbed to the monkey board on BIG FOOT II and found that a cotter pin did actually secure the ratchet pin there. He noted, however, that the cotter pin was too small for the hole—being only ⅓ the diameter of the hole—and was already badly worn. He replaced it with a bolt and nut.

Donald Branham, an officer of Branham, testified that the monkey board was delivered to the erector in parts for assembly by Crown Rig at the shipyard. Branham's testimony indicated that Crown Rig was responsible for the installation of the ratchet pin and its cotter, or safety pin. A Crown Rig erector, Louis Young, testified to the contrary. He recalled that the monkey board arrived at the shipyard already assembled and with the ratchet handle in place.

The Branham shop drawings do not clearly show whether the ratchet handle mechanism was attached to the monkey board before shipment, or installed in the field by the erector. The ratchet pin is listed along with other component parts that the court believes were to have been pre-assembled. The cotter pin however, is listed with "field bolts," implying that the ratchet pin, and therefore the ratchet handle itself, were installed by Crown Rig in the field. The two U bolts that actually secure the monkey board to the horizontal pipe "rails" on which it rolls are not listed with field bolts. Rather, they are detailed with the pre-assembled components, even though they, among all the connectors on the monkey board, are the bolts most likely to be field installed. The information on the drawing is ambiguous.

## III. LIABILITY

There is but one obviously innocent party to this lawsuit: the plaintiff. Bass was simply doing his job when disaster befell him. He observed safety rules by wearing his hard hat—a fact to which he no doubt owes his life—and was relying, as he had to, on the workmanlike conduct of his cohorts and those who designed, fabricated, and erected the rig.

It is undisputed that the ratchet handle fell from the monkey board and thereby caused Bass to suffer serious bodily harm. Absent some devious tampering, of which there is no evidence, the handle could fall only if the ratchet pin vibrated out of its hole. Moreover, the pin could back out of the hole in the handle only if the cotter pin did not secure it. The cotter pin could have either failed, been improperly installed, or never installed. In no event, however, could the handle have fallen had a big enough pin, properly installed, been in place in the end of the ratchet pin.

Phoenix did not select the drawworks and related equipment it wanted until late in the fabrication of the derrick. By then, work was advanced to the point that the crown assembly had to be oriented in a specific way. That orientation was such that the block would strike the monkey board extension each time it was raised. It was the frequent collision of the block and the monkey board, causing the board to vibrate vigorously, that ultimately resulted in the fall of the handle.

The ongoing impact of the block upon the monkey board finally prompted Phoenix to alter the crown's orientation relative to the rig. After the crown was rotated 90 degrees, the block could pass the monkey board without jarring it.

The court further observes that even an undersized cotter pin would not likely have failed after only five days of intermittent drilling unless there had been excessive vibration in the derrick. Such vibration was present by virtue of the crown block re-

peatedly striking the monkey board when the crew raised the block.

The court is aware that a block will occasionally strike a monkey board extension. That is why the extension was hinged and capable of flipping up. But it does not appear to the court that the monkey board was designed to withstand regular pounding by the crown block. Indeed, Branham expressed its apprehension about interference of the derrick and the block to Phoenix. Certainly, the collision of block and monkey board were perceived by Phoenix from the outset of drilling operations. Had the problem been promptly remedied or avoided from the outset, as due care indicated, the board would not have been routinely jarred. The handle, however inadequately secured, would have been far less likely to come loose and fall absent the jarring.

The court concludes that Phoenix was negligent in failing to provide Bass a safe place in which to work. In failing to correct an obviously hazardous condition in the derrick, it was at least partially responsible for the injury of Bass.

It is the opinion of the court that Branham was negligent in the design and manufacture of the monkey board assembly. Given Branham's anticipation of the interference of the monkey board with the block, it should have taken more care to provide a strong, reliable safety pin to secure the ratchet pin instead of specifying so small a cotter pin. Moreover, in light of the virtual impossibility of inspecting the cotter pin once the monkey board was installed aloft, and the unlikelihood of its later inspection, Branham should have either used a safety pin that would not fail under the worst of conditions, or installed a safety chain as a backup device. It is manifest that the cost of either precaution would have been de minimis relative to the potential harm created in their absence.

Crown Rig, although least culpable of the defendants, is not without fault. Crown Rig had a duty to Phoenix to properly and safely assemble the derrick. Implicit in that duty of workmanlike performance was its obligation to inspect the components that Branham furnished—before, during, and after erection. Naturally, if Crown Rig assembled the monkey board from parts, its failure to properly install the cotter pin would be negligent. But even if the monkey board came to the shipyard pre-assembled, Crown Rig had a duty to at least cursorily examine the mechanism for secure connections.

The specified cotter pin was, the record indicates, one third the diameter of its hole. Therefore, even if the pin, albeit undersized, was properly installed by Branham, Crown Rig was negligent in its inspection. A reasonable rigger, in the exercise of due care, should have detected the undersized pin just as he would notice undersized bolts in a beam connection.

Having carefully reviewed the photographs, drawings, and testimony of the witnesses, the court concludes that the monkey board was most likely shipped by Branham as an assembled component. It is the finding of the court that the cotter pin specified by Branham was too small for the ratchet pin hole and for its intended purpose. Branham was derelict in not installing a more reliable safety device. The court also finds that Crown Rig failed to properly inspect the monkey board assembly upon its delivery and prior to its erection in the derrick. The court believes that a reasonable inspection by Crown Rig would have detected either the absence or inadequate size of the cotter pin. Finally, Phoenix negligently persisted in the operation of the derrick despite the repeated collisions of the block and monkey board.

The court concludes that the negligent acts and omissions of the parties, described above, were each a proximate cause of the injury of Bass. It is the finding of the court that: the designer and fabricator of the rig, Branham Industries, bears 40% of the proportionate fault; the erector of the derrick, Crown Rig Builders, Inc., bears 20% of the proportionate fault; and the owners and operators of the drilling vessel, Phoenix Seadrill/78, Ltd. and Phoenix Man-

agement Corp., bear the remaining 40% of the proportionate fault.

## IV. DAMAGES

■ The plaintiff, Bass, sustained a severe injury through no fault of his own. His skull was partially shattered, his brain bruised, and some teeth broken by the impact of the ratchet handle. Bass is remarkably fortunate to have recovered as rapidly and extensively as he did. His recovery, however, will never be complete. Bass has permanent brain damage. He has thereby lost the lower quadrant of vision in his right eye, and has impaired peripheral vision above the left quadrant of the right eye. Moreover, Bass claims to suffer recurring headaches several times a week for which he takes medication. There is some evidence that Bass also experiences emotional or psychological difficulties as a result of his injury.

The vocation of Bass was an arduous but well paying trade in which he could have worked for many years to come. The impairments caused by his injury however, foreclose the possibility of returning to that trade. Although physically able to perform the tasks required of him, Bass would face undue risk of further injury at work by virtue of his impaired peripheral vision. As a result of his injury on board BIG FOOT I, Bass has suffered a loss of future earning capacity, as well as lost wages during his recovery. He also has suffered intense physical pain and mental suffering, which is likely to continue, to some degree, for an indefinite time. Bass also incurred substantial medical expenses, and will require ongoing medical treatment in the future. The court finds that the aggregate damages sustained by Bass, including the discounted present value of his future damages, equal SIX HUNDRED FIFTY THOUSAND DOLLARS ($650,000).

## V. PROPORTIONATE FAULT

Under general admiralty principles applicable here, the liability of the negligent defendants to pay damages is shared in proportion to their comparative fault. *U.S. v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (replacing "divided damages" rule with proportionate fault allocation in maritime collision cases); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953) (applying the admiralty rule of comparative negligence to unseaworthiness case); *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir.1979) (extending proportionate fault rule in maritime case involving joint tortfeasors).

■ That a product liability claim is joined with a Jones Act negligence claim does not affect the application of the proportionate fault doctrine except where the otherwise insignificant comparative negligence of the plaintiff would reduce his recovery from a manufacturer. *See, e.g., Lewis v. Timco, Inc.,* 697 F.2d 1252 (5th Cir.1983). Whether the acts and omissions of Branham and Crown Rig are characterized as negligence, or the product of their work—the drilling rig—is labeled "defective" or "unreasonably dangerous," does not change the responsibilities of the defendants. Liability for non-collision maritime personal injuries "is to be allocated among the parties proportionately to the comparative degree of their fault." *Loose v. Offshore Navigation, Inc.,* 670 F.2d 493, 500 (5th Cir.1982), *quoting Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246, 1248 (5th Cir.1979).

## VI. THE SETTLEMENT AGREEMENT

Bass settled with Phoenix before trial by executing a document styled "Agreement and Release of Certain Parties" ("the Agreement"). On the first day of trial, Crown Rig, although not a party to the settlement, moved to void the Agreement. Branham thereafter joined in the motion. In the Agreement, Bass ostensibly agreed to "assign part of his cause of action and a portion of its proceeds to [Phoenix]." In addition, Phoenix paid Bass $210,000 for the release and settlement of his cause of action against it, as well as his promise to indemnify it and the vessel from any claims arising out of his injury. Moreover, the Agree-

ment prohibited Bass from settling with another defendant unless he first obtained the consent of Phoenix.

Bass assigned to Phoenix the right to receive up to $178,000 out of the first $251,000 Bass recovered from the remaining defendants. The Agreement entitles Phoenix to 100% of the first $105,000 recovered, and to 50% of the next $146,000. If Bass recovers more than $251,000, Phoenix will receive a total of $178,000 to offset its initial payment of $210,000, leaving it a net cost to settle of only $32,000.

Agreements of this sort have been named "Mary Carter agreements" for an early case upholding the validity of such an agreement. *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.App.1967). This court recently refused to enforce a similar agreement because it believed the agreement unfair to the settling seaman. *Wilkins v. P.M.B. Systems Engineering, Inc.,* 553 F.Supp. 201 (E.D.Tex.1982).

, The court continues to be troubled by the Mary Carter approach to settlements. It strikes the court as manifestly unfair that an allegedly negligent joint tortfeasor can settle with a plaintiff, thereby limiting his liability at trial, and then get a refund from damages paid by the nonsettling tortfeasors.

In their motion to void the settlement, Crown Rig and Branham denounced the Agreement as against public policy, champertous, abusive of the judicial process, and an impediment to settlement with the other defendants. Crown Rig and Branham ask the court to invoke the traditional power of the admiralty court to invalidate inequitable releases and settlements. *See generally,* M. Norris, *The Law of Seamen 3d ed.* sections 501–521 (1970 & Supp.1982). Accordingly, the court has carefully scrutinized the Agreement to determine if the plaintiff, as a "ward of the admiralty," has been overreached. *See Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942).

## VII. WHAT'S WRONG WITH MARY?

Other courts have wrestled with the problems posed by these often secret, rebate type settlements and, one suspect, few have come away from their encounters with much satisfaction. *See* Note, *Mary Carter Agreements in Maritime Personal Injury Suits,* 22 So.Tex.L.J. 545 (1982).

When parties to jury trials have entered such secret agreements, courts have found cause to grant a new trial. *G.M.C. v. Simmons,* 558 S.W.2d 855 (Tex.1977) (calling the "financial interest" of settling defendant a proper subject of disclosure); *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir.1979) (holding jury should have been informed that ostensibly neutral witnesses had interest in lawsuit); *Daniel v. Penrod Drilling Co.,* 393 F.Supp. 1056 (E.D. La.1975) (finding parties to secret agreement threatened integrity of trial process and could mislead jury).

Although courts have found the agreements sufficiently injurious to the jury trial process to order a new trial, few courts have actually invalidated the settlement itself. The most frequently cited example of an invalidation is *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (Nev.1971). That Court held a Mary Carter agreement void as against public policy because it: fostered champerty and maintenance, had attorneys representing conflicting interests, and violated a real parties in interest procedural rule.

The motion of Crown Rig and Branham concludes that the Agreement is "against public policy" and should be held void by the court. That conclusory assertion must, however, be predicated upon findings that the Agreement has consequences that are themselves contrary to public policy. The evil consequences the movants attribute to the Agreement are: abuse of judicial process, fostering champerty, and deterrence of settlements.

In analyzing the Agreement, the court notes that it has three important elements. Basically, Bass agreed to do the following:

(1) release and settle all claims he has against Phoenix and the vessel "in consideration of the sum of $210,000;"

(2) assign to Phoenix a portion of his cause of action in the amount of $178,000; and

(3) give Phoenix the right to veto any settlement agreement.

The charge that Phoenix abused the judicial process challenges the Agreement as a whole, while the charges of champerty and settlement inhibition apply only to elements (2) and (3). The objections of Crown Rig and Branham are discussed below in that order.

■■■ A.  ABUSE OF JUDICIAL PROC-ESS.  That secret settlement agreements can cause the fact finder or other parties to the litigation to be misled is not disputed. Ignorant codefendants may divulge damaging information or trial strategy to the defendant who has secretly settled.  Moreover, when the interests of the parties are not as they appear, the trier of fact may attribute unwarranted significance to the testimony of the parties.  As noted above, new trials have been granted when the courts believed the juries to have been misled or confused because of Mary Carter agreements.

Of course, no jury is here involved.  The court does not claim to have been deceived by virtue of the Agreement, nor can the other defendants, because the Agreement was filed with the clerk of the court in December, 1981.  Being aware that Phoenix claimed a financial interest in Bass' cause of action, the court could make allowances for possible bias of Phoenix witnesses. Moreover, the non-settling defendants had ample time to alter their trial strategy to deal with the "defection" of Phoenix.  By making full disclosure of the Agreement six months before trial, Phoenix made moot any charges that the Agreement affected the integrity of the trial process.  It is the opinion of the court that the effective realignment of the parties by virtue of the Agreement did not affect the ability of the court to make accurate findings of fact.

Inasmuch as Bass and Phoenix did not deceive the court or the parties about the terms of their settlement and release, the court finds element (1) of the Agreement to be reasonable.  It generally describes a traditional settlement and release that the court will sustain.  In explicit and repetitive phrases the Agreement emphasizes the extent of Bass' injuries, his alternative remedies, and the fact that "in consideration of the sum of two hundred ten thousand dollars ($210,000) . . . [Bass] releases and forever discharges [Phoenix] and the vessel . . ."  It appears to the court that, with respect to the settlement and release elements of the Agreement, Phoenix did not overreach or take unfair advantage of Bass.

Elements (2) and (3) of the Agreement however, introduce "unusual stipulations" that appear to renounce advantages secured to seamen by the general principles of maritime law.  As such, "they will be set aside unless they are reasonable in themselves and founded on an adequate consideration * * * "  *The David Pratt,* F.Cas. No. 3597 (D.C.Me.1839).  *See Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942).  It is therefore element (2), the assignment, and element (3), the settlement veto power, that require further scrutiny.

B.  CHAMPERTY.  Crown Rig calls the Agreement an instance of champerty and maintenance because Phoenix has obtained a financial interest in the plaintiff's cause of action, "even though they do not own a portion of [it] by assignment or otherwise, and were not harmed by the accident . . ." Crown Rig's conclusory assertion is not entirely accurate.  By explicit terms, the Agreement does purport to "assign part of [Bass'] cause of action and a portion of the proceeds to [Phoenix]."  Indeed, it is the fact of the assignment which raises the question of champerty.

■■■ An agreement is champertous when one without interest in another's lawsuit undertakes to carry on the litigation at his own expense, at least in part, in exchange for part of the proceeds if the lawsuit is successful.  Champerty is a form of maintenance, i.e., officious intermeddling in a suit in which one has no interest by assisting a party in its prosecution.  *Martin*

*v. Morgan Drive Away, Inc.,* 665 F.2d 598, 603 (5th Cir.1982).

In declining to enunciate a federal common law of champerty with respect to the assignment of antitrust claims, the Court of Appeals for the Fifth Circuit elected to adopt "federalist conflict of law notions which suggest that local law will control." *Id.,* at 605. The seaman's assignment in this admiralty case does, however, "implicate 'uniquely federal interests' of the kind that oblige courts to formulate federal common law." *See Texas Industries v. Radcliff Materials,* 451 U.S. 630, 642, 101 S.Ct. 2061, 2068, 68 L.Ed.2d 500 (1981).

■ By the terms of the Agreement, Phoenix undertook, at least in part, to carry on the litigation at its own expense, in exchange for part of the proceeds. Phoenix did not, as the original and sole Jones Act defendant in the lawsuit, have an "interest" in the lawsuit as the term relates to champerty. Although not a stranger to the lawsuit, Phoenix had no interest in the relief demanded by Bass. To the contrary, the interests of Phoenix were diametrically opposed to those of Bass. Moreover, the assignment itself was insufficient to create a non-champertous interest in the seaman's litigation. Unless the legal interest exists before the financial interest is assigned, the assignment is champertous.

Moreover, if there were any doubt as to Phoenix having had an interest in the Bass cause of action before the Agreement was executed, there can be none after that event. By the Agreement, Bass specifically and unequivocally "releases and forever discharges" Phoenix and promises to indemnify it from any claims of others. Having obtained a release from Bass and no longer a defendant in the lawsuit, Phoenix became merely an officious intermeddler in the Bass cause of action.

■ C. SETTLEMENT DETERRENT. The third reason for invalidation urged by Crown Rig and Branham is the rationale that Mary Carter agreements deter settlements. Since settlements provide a favored disposition of lawsuits, impediments to the settlement process are against public policy, Crown Rig and Branham reason. With that assertion, the court heartily agrees. A steadily swelling docket makes this court increasingly reliant on settlements to dispose of its caseload. Out of necessity, the court discourages actions of parties that undermine settlements.

Crown Rig argues that the Agreement is so unbalanced—letting Phoenix off the hook at the expense of itself and Branham—that they had no choice but to go to trial rather than settle. The court finds that argument somewhat appealing. It appears that the non-settling defendants, Crown Rig and Branham, are put in a position where they cannot settle because the price is too high. That is, since Bass, who presumably values his case at several hundred thousand dollars, will net only $32,000 from his settlement with Phoenix, he is likely to demand that Crown Rig and Branham pay far more than what would ordinarily be "their share." They might each have been willing to pay Bass one third of his damages. Rather than pay more, Crown Rig and Branham chose to accept the risks of a trial.

That much is clear. To the extent a Mary Carter agreement gives the settling defendant a large share of the plaintiff's first dollar recovery, settlement with remaining defendants is impeded. While the court realizes that every settlement—including the traditional kind—affects later settlement negotiations to some degree, it strongly suspects that Mary Carter agreements unduly hinder negotiations. While that suspicion can never be proven to a certainty, the court believes it to be justified. The non-settling defendant surely becomes all the more recalcitrant knowing that a large percentage of his payment to the plaintiff will go to another defendant.

The Agreement creates more than a mere psychological obstacle to settlement negotiations however. By virtue of the last clause in the Agreement, Phoenix acquired the power to actually prevent .Bass from settling with the other defendants. Phoenix thereby acquired, in addition to the

large financial interest in the lawsuit it claims, the effective control of the litigation, as well. Phoenix should have been content to rely upon Bass, acting in his own economic self-interest, to obtain its goal: that Bass recover at least $251,000 from the remaining defendants. By extracting such control over the Bass lawsuit, Phoenix egregiously overreached the seaman.

**D. INEQUITY OF CONSIDERATION.** The court is further disturbed by the apparent lack of consideration paid by Phoenix for the assignment and veto power. Given the severity of the plaintiff's injuries and his obvious absence of fault, plus the apparent culpability of all the defendants, Phoenix needed no clairvoyance to expect Bass to recover a sizeable award or settlement from the remaining defendants. Phoenix was therefore risking very little in the Agreement. It had a high probability of recovering $178,000 because it was virtually certain that Bass would recover at least $251,000, the minimum needed to pay Phoenix its full share.

The Agreement emphatically states that the consideration given to Bass to obtain his settlement and release is $210,000, and the court finds that to be a reasonable amount. The Agreement addresses that point in ten phrases, making abundantly clear the fact that Bass receives $210,000 in consideration of his releasing Phoenix. No provision is made, however, as to consideration for the assignment of a $178,000 share in the proceeds of the lawsuit. Moreover, the Agreement explicitly states that Phoenix shall never be obliged to pay Bass more than $210,000. Therefore, such consideration as Phoenix paid for the assignment and veto power must have been part of the $210,000.

Since the sum of the payments for the release and the assignment with veto power equals $210,000, increasing one payment reduces the other by the same amount. The court finds that, given any reasonable price for the release, Phoenix did not pay a reasonable amount for the assignment with veto power. The $210,000 paid is simply inadequate consideration for the assignment, with power to prevent settlement, of

a $178,000 share in the proceeds of the litigation in addition to the release of Bass' substantial claim against Phoenix.

**E. CONCLUSION.** The court has approached and reviewed the Agreement with that "solicitude with which admiralty has traditionally viewed seamen's contracts * * *." *See Garrett v. Moore-McCormack Co., Inc.,* 317 U.S. 239, 246, 63 S.Ct. 246, 251, 87 L.Ed. 239 (1942). The court interprets the assignment and veto provisions of the Agreement in light of the standard traditionally applied by the Court in admiralty cases:

> If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that *pro tanto* the bargain ought to be set aside as inequitable * * *

*Id.; quoting Harden v. Gordon,* Fed.Cas. No. 6047 at 480 (C.C.Me.1823). The burden on the vessel is particularly heavy when, as is the case here, there has been inadequacy of consideration. Phoenix has failed to meet that burden with respect to the assignment and its power to prevent Bass from settling his lawsuit.

The inequality in the terms, the disproportion in the bargain, and the sacrifice of rights uncompensated by extraordinary benefits lead the court to find the assignment and veto power to be unjust and unreasonable. The court concludes that the assignment provision of the Agreement is not only champertous, but fails as well for want of consideration. The power of Phoenix to prevent settlement is equally onerous. The provisions violate the rights of the seaman secured by the general principles of maritime law and this court will not enforce them.

Accordingly, the motion of Crown Rig and Branham to void the Agreement between Phoenix and Bass is hereby DENIED with respect to the settlement and release

and GRANTED as to the assignment and consent of settlement provisions.

## VIII. FINAL JUDGMENT

Having carefully reviewed the record, the evidence, and briefs filed by the parties, the court finds that the negligent acts and omissions of the defendants, Crown Rig Building Services and Branham Industries, Inc., and of the third party plaintiffs, Phoenix Seadrill/78, Ltd. and Phoenix Management Corp., were the proximate cause of the injury of the plaintiff, Ronnie Gene Bass. The court finds the proportionate fault of the negligent parties to be: Crown Rig, 20%; Branham Industries, 40%; and Phoenix Seadrill/78, Ltd. and Phoenix Management Corp., 40%. Ronnie Gene Bass suffered damages in the amount of SIX HUNDRED FIFTY THOUSAND DOLLARS ($650,000). It is therefore

ORDERED, ADJUDGED, and DECREED that judgment be entered for the plaintiff RONNIE GENE BASS against defendant CROWN RIG BUILDING SERVICES in the amount of ONE HUNDRED THIRTY THOUSAND DOLLARS ($130,000), and against defendant BRANHAM INDUSTRIES, INC. in the amount of TWO HUNDRED SIXTY THOUSAND DOLLARS ($260,000). As against the defendants PHOENIX SEADRILL/78, LTD. and PHOENIX MANAGEMENT CORP., BASS shall take nothing by virtue of the Agreement between them. Interest shall accrue on the judgments at the rate of 8.98% per annum from this date until paid in full.