**In re MGM GRAND HOTEL FIRE LITIGATION.**

MDL No. 453.

United States District Court, D. Nevada.

July 12, 1983.

As Amended Aug. 12, 1983.

John J. Cummings, III, New Orleans, La., Stanley M. Chesley, Cincinnati, Ohio, Wendell H. Gauthier, Kenner, La., Melvin M. Belli, San Francisco, Cal., Toxey H. Smith, Los Angeles, Cal., Will S. Kemp, Las Vegas, Nev., Joseph W. Cotchett, San Mateo, Cal., Leonard M. Ring, Chicago, Ill., J. Bruce Alverson, Las Vegas, Nev., Joseph Weiner, Philadelphia, Pa., for plaintiffs.

Allan B. Goldman, Los Angeles, Cal., Stephen L. Morris, James Olson, Las Vegas, Nev., for MGM.

Leland Eugene Backus, A. William Maupin, Las Vegas, Nev., for Taylor Const. Co.

Rex Jemison, Corby Arnold, Las Vegas, Nev., for Martin Stern, Jr., AIA Architect d/b/a Martin J. Stern Architect and Associates.

G. Edward Fitzgerald, Richard McKnight, Los Angeles, Cal., for Cal. Elec. Const. Co.

Samuel A. Harding, Las Vegas, Nev., for Continental Mechanical Corp.

Nicholas W. Hornberger, Los Angeles, Cal., for Otis Elevator.

James F. Pico, Las Vegas, Nev., for Clark County Departments and Political Subdivisions.

John F. O'Reilly, Las Vegas, Nev., for W.J. Thompson, Inc.

Duane Tewell, Seattle, Wash., for Simpson Timber Co.

Samuel T. Rees, Beverly Hills, Cal., for Cadillac Plastic & Chemical Co.

Tom H. Foulds, Seattle, Wash., for American Protection Ins. Co., Lumbermens Mut. Cas. Co., Kemper Corp., American Motorist Ins. Co., American Manufacturers Mut. Ins. Co., and American Protection Ins. Co.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

## I. INTRODUCTION AND FACTS

On Friday, November 21, 1980, at approximately 7:00 A.M., a fire broke out in the delicatessen at the MGM Grand Hotel and Casino in Las Vegas, Nevada. The fire spread through the casino and caused heavy smoke and toxic gases to fill the twenty-six story high-rise. Approximately 3,400 registered guests and a number of hotel employees were in the hotel on the morning of the fire. As a result of the fire and heavy smoke and gases, eighty-four persons died

in various locations in the casino and hotel. Sixty-one fatalities were documented in the high-rise tower (twenty-five in rooms, twenty-two in corridors, nine in stairways and five in elevators), eighteen fatalities were documented on the casino level and five others were moved before being pronounced dead by officials. In addition, three more fatalities occurred within a year of the fire. Over one thousand persons suffered injuries due to smoke inhalation and hundreds of others suffered sprains, broken bones and lacerations in escaping the fire. According to a report issued by the National Fire Protection Association in cooperation with the Federal Emergency Management Agency, National Bureau of Standards and United States Fire Administration, the major factors that contributed to the injuries and loss of life were the following:

Rapid fire and smoke development on the Casino level due to available fuels, building arrangement, and the lack of adequate fire barriers.

Lack of fire extinguishment in the incipient stage of fire.

Unprotected vertical openings contributed to smoke spread to the high-rise tower.

Substandard enclosure of interior stairs, smokeproof towers and exit passageways contributed to heat and smoke spread and impaired the means of egress from the high-rise tower.

Distribution of smoke throughout the high-rise tower through the heating, ventilating and air conditioning equipment.

Smoke spread through elevator hoistways to the high-rise tower.

*Investigation Report on the MGM Grand Hotel Fire by National Fire Protection Association,* at v (rev. January 15, 1982).

Lawsuits were filed against MGM Grand Hotels, Inc. and MGM Grand Hotel-Las Vegas, Inc. (collectively referred to as "MGM") and other defendants across the United States in numerous federal and state courts. All of the state court cases except those filed in California and Nevada between non-diverse parties were removed to federal court. The first lawsuits, filed in

December, 1980, were assigned to the Hon. Roger L. Foley. On December 9, 1980, an Interim Committee of Plaintiffs' Counsel was appointed to serve on behalf of all plaintiffs. Pretrial Order No. 1. On December 22, 1980, the first pretrial conference was held. On January 30, 1981, the Court entered its first Order which stayed further discovery and the appointment of a permanent committee of plaintiffs' counsel until the outcome of the motions for transfer and consolidation pending before the Judicial Panel on Multidistrict Litigation. Pretrial Order No. 1.

On May 5, 1981, the Judicial Panel on Multidistrict Litigation acted on the motions and transferred all federal court actions to the United States District Court for the District of Nevada for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. This judge was then assigned, pursuant to an intercircuit assignment order issued by Chief Justice Warren E. Burger, to the District of Nevada to handle the pretrial proceedings. On June 18, 1981, the first pretrial conference by this judge was held. Thereafter, on August 13, 1981, the Plaintiffs' Legal Committee ("PLC") was appointed to initiate, coordinate and conduct all pretrial liability and damage discovery on behalf of all plaintiffs who filed civil actions governed by the MDL No. 453 and known as the "MGM Grand Hotel Fire Litigation." Pretrial Order No. 8. Moreover, in that Order, the Court provided that all settlements agreed to and fully consummated by 4:00 P.M., Monday, September 21, 1981, would be presumed to have been achieved without material benefit by the work of the PLC and that accordingly no consideration to an assessment of the settlements would be given by the Court for the work of the PLC. Pretrial Order No. 8, ¶ 9(B). Any settlements arrived at after September 21, 1981, would be presumed to have benefited from the efforts and work of the PLC and an assessment would be made on those settlements. Pretrial Order No. 8, ¶ 9(C). The assessment was ordered at a sum equal to five percent (5%) of the gross settlement

amount for the PLC's members' fee and a sum equal to one and one-half percent (1½ %) of the gross settlement amount for costs. *See* Pretrial Order No. 75. As a result of that Order, many settlements were arrived at before September 21, 1981, between plaintiffs and MGM both in filed and unfiled claims. The first wave of discovery proceeded and various pretrial motions were filed by both plaintiffs and defendants with the Court.

The Hon. Philip M. Pro, United States Magistrate, was appointed pursuant to 28 U.S.C. § 636(b) and Rule 11(c) of the Rules of Practice of the United States District Court for the District of Nevada, to have authority over all non-dispositive civil motions, petitions and applications, including discovery, by this Court. Pretrial Order No. 6. Pretrial conferences were held on September 9 and November 18, 1981, February 10, June 2, and September 29, 1982, and February 1, 1983. Moreover, discovery conferences were held weekly by the Hon. Philip M. Pro. To date, seventy-eight discovery conferences have been held by Magistrate Pro.

In a spirit of cooperation often not seen between federal and state courts, it was agreed between the respective courts in Nevada and the parties that the discovery developed in this MDL No. 453 could be used in the suits pending before the Nevada state courts. In addition, a similar fee assessment in the amount of five percent (5%) for PLC fees and one and one-half percent (1½%) for PLC costs was approved by the Hon. J. Charles Thompson, District Judge for the Eighth Judicial District Court of the State of Nevada as the assessment to apply to Nevada state cases arising out of the fire. Pretrial Order Nos. 94 and 95. On December 1, 1981, due to the complexity of the litigation and the need for the efficient scheduling and completion of the taking of oral depositions, Michael Cherry, Esquire, was appointed by both courts as Special Master to establish and administer an oral deposition plan of all witnesses. Pretrial Order No. 37.

On March 9 and 10, 1982, the Court heard oral argument on the motions to dismiss and for summary judgment filed by defendants and third-party defendants based on N.R.S. 11.205. That statute provided that no suits could be brought against any person involved in the design, planning, supervision or observation of a construction project six years after substantial completion of the construction project, except the owner or occupier of the improvement to real property. Because the constitutionality of the statute was then before the Nevada State Supreme Court and for a variety of other reasons, on June 2, 1982, the motions were denied without prejudice. On March 31, 1983, N.R.S. 11.205 was declared unconstitutional by the Nevada Supreme Court in *State Farm Fire and Casualty Company v. All Electric Inc., et al.*, 660 P.2d 995 (Nev.1983). Following the hearing on March 9, 1982, settlement was explored for the first time by both plaintiffs and defendants. At a settlement conference held in Philadelphia, Pennsylvania, on March 25, 1982, defendants and third-party defendants, both MGM and remaining defendants ("Non-MGM"), stated their desire for a "global settlement" of all wrongful death, personal injury and property damage claims resulting from the November 21, 1980 fire. *See* Pretrial Order Nos. 86 and 87. Estimates of the remaining wrongful death and personal injury claims were in excess of $350,000,000.00. A "global settlement" was expressed by defendants and third-party defendants as the only type of settlement which defendants and third-party defendants would be willing to enter because of the need to resolve all claims and end all litigation, both in federal and state court. Before any defendant or third-party defendant would participate in a "global settlement," it was further required that each defendant or third-party defendant be released from the property subrogation claims held by the Kemper Insurance Group ("Kemper") which totaled $141,000,000.00 paid to MGM for its own property damage and business interruption losses. The prospect for a prompt settlement at this time was further inhibited because the statute of

limitations on death and personal injury claims would not expire for eight months into the future. Nevertheless, in furtherance of the interest of the Court and the parties to commence a settlement course, the Court, on June 18, 1982, appointed Richard R. Rogan, Esquire, of Burbank, California, as the Settlement Coordinator to meet individually with all defendants and third-party defendants to attempt to accumulate a settlement fund in order to achieve a "global settlement." Pretrial Order No. 154. Mr. Rogan met with each of the defendants and third-party defendants individually and in groups from June 6, 1982, until December 27, 1982, in the attempt to assemble this settlement fund. Pretrial Order Nos. 227 and 255. At the request of the PLC, in order to avoid any conflict between the PLC itself and all of the plaintiffs' interests the committee represented, the Court met individually with each of the attorneys representing every plaintiff interest in order to arrive at an evaluation of that plaintiff's claim. These meetings transpired at the same time that the Settlement Coordinator was meeting with defendants and third-party defendants. At each of the meetings, evaluations were made for compensatory damages only, and without regard or consideration of punitive damages. These meetings began before the expiration of the statute of limitations, which was to run on November 21, 1982, and, thus, it was obvious by all the parties that additional monies would have to be forthcoming for future unfiled or discovered claims. Meetings with plaintiffs' attorneys were held in Los Angeles, California, on July 6, 7 and 8; in Philadelphia, Pennsylvania, on August 16, 17 and 18; in Las Vegas, Nevada, on February 2 and 3, 1983; and in Philadelphia, Pennsylvania, on February 10, 1983. At each meeting the plaintiff's attorney presented the plaintiff's settlement demands and any documentary support in the form of medical bills, doctor's reports, loss of wage statements and income tax returns for the wrongful death, personal injury or property damage claims. Following these meetings, valuations for each of the plaintiff's claims were arrived at between the Court and each attorney which then totaled a sum certain necessary for a "global settlement." Meanwhile, discovery continued and pretrial and discovery conferences were held.

On October 26, 1982, the Court granted plaintiffs' motion for leave of Court to file amended complaints in which plaintiffs now named the third-party defendants as direct defendants. Plaintiffs also named as defendants fourteen additional parties not previously sued in MDL No. 453. Pretrial Order No. 224. All total, there are one hundred eighteen defendants. Master Amended Complaint and Demand for Jury Trial. Nine defendants were MGM defendants, one hundred five defendants were non-MGM defendants, and four defendants were Kemper defendants. MGM defendants consisted of the corporations, officers and stockholders who owned and operated the MGM Grand Hotel and Casino. Non-MGM defendants consisted of the architects, general contractor, contractors, subcontractors, materialmen, suppliers and inspectors involved both with the original construction of the hotel and casino from 1972 to 1974 and any later remodeling or maintenance of the hotel and casino before the fire. Kemper defendants consisted of the companies that make up the Kemper Insurance Group which provided fire property and business interruption insurance to MGM and which inspected the hotel and casino for fire code violations.

Unfortunately, but predictably, defendants, despite the efforts of the Settlement Coordinator, were unable to agree upon a joint settlement fund, although many important commitments and terms and conditions were developed respecting individual defendant offers, comparative ranges and settlement conditions. Thereafter, the PLC itself began to negotiate individually with each defendant. On December 29, 1982, the PLC entered into an "Agreement· for Releases and Settlement" and "Contract for a Common Plan of Litigation" with Kemper in order to obtain the needed Kemper releases for purposes of the "global settlement." In Appendix "A" to the "Agree-

ment for Releases and Settlement," Kemper listed one hundred thirteen defendants, both MGM and various non-MGM defendants, which it agreed to release from its $141,000,000.00 property damage subrogation claim if the defendants entered into a settlement agreement with plaintiffs. These defendants were denominated as "Group A" defendants. Appendix "A", Agreement for Releases and Settlement. The value of the Kemper releases for "Group A" defendants was $10,000,000.00. Contract for a Common Plan of Litigation, ¶ 3(d). Kemper listed a second category of eleven defendants, now known as "Group B" defendants, which it refused to release from its property damage subrogation claims because of its contemplated lawsuit against these defendants.[1] Under the Contract for a Common Plan of Litigation, as amended by Supplemental Agreement (June 24, 1983), plaintiffs and Kemper agreed to share their recoveries against "Group B" defendants with the first $10,000,000.00 to go to Kemper, the second $10,000,000.00 to go to plaintiffs, and a 50/50 sharing thereafter, all subject to Court approval. Kemper was to receive the first $10,000,000.00 because of the Kemper releases provided to "Group A" defendants. Plaintiffs were to receive the second $10,000,000.00 and a 50% share in any additional joint recoveries against "Group B" defendants as consideration for the PLC's assistance in the assertion of the actions and claims and in consideration of plaintiffs' dismissal of Kemper as a defendant tortfeasor. Contract for a Common Plan of Litigation, as amended. The sharing of recoveries is subject to Court approval and no sharing of recoveries by virtue of judgments against a "Group B" defendant will result unless both the plaintiffs and Kem-

per recover against the "Group B" defendant. Second Supplemental Agreement, ¶¶ II and III.

On January 3, 1983, having secured the necessary mechanism for obtaining the needed Kemper release, the PLC entered into a "Settlement Stipulation" with MGM for $75,000,000.00. Under the terms of the agreement MGM deposited a sum of $25,000,000.00 with the American Bank & Trust Co. of Pa., the trustee for the settlement fund, upon the signing of the agreement and agreed to deposit an additional $25,000,000.00 within twenty-one days of the furnishing of the final list and releases, $8,333,333.33 on August 31, 1984, and $16,666,666.67 on August 31, 1985. MGM Settlement Stipulation, as amended, ¶ 4. The present value of the settlement was estimated at $69,000,000.00. As further consideration for the settlement, MGM agreed to indemnify for compensatory damages certain non-MGM defendants against unsettled claims if a non-MGM defendant required such an indemnity as further protection before it would settle with plaintiffs. MGM Settlement Stipulation, as amended, ¶ 5 and Rider and Addendum to Settlement Stipulation, ¶ 10.

Subsequently, settlement agreements were entered into between the PLC and forty-seven defendants including non-MGM "Group A" defendants and Simpson Timber Company, a "Group B" defendant. A list of the one hundred eighteen defendants, their status and grouping in this litigation, and the date and amount of any settlement appears below. The defendants have been grouped into three categories: MGM, non-

---

1. The Kemper "Group B" defendants are as follows: (1) Apache Plastics, Inc., subsidiary of Apache Corporation, successor in interest to Kerona Plastic Extrusion Company and Kerona, Inc.; (2) Rohm & Haas; (3) Olson Glass Company, Inc.; (4) General Tire & Rubber Co.; (5) Owens Corning Fiberglas Corp.; (6) Simpson Timber Company; (7) Essex Chemical Corporation; (8) Sav-Mor Upholstery Supply; (9) Corona Plastics a/k/a Corona Plastic; (10) E.I. DuPont de Nemours & Co., Inc.; (11) Colum-

bus Coated Fabric, Inc., a subsidiary of Borden Industries, and their predecessors and successors. Contract for a Common Plan of Litigation, ¶ 3. Corona Plastics a/k/a Corona Plastic have been dismissed. Kerona Plastic Extrusion Company and Kerona, Inc. were substituted. *See American Protection Insurance Co. v. Apache Plastics, Inc.*, MDL No. 453 (Complaint). Duo-Flex Corporation has also been moved as a "Group B" defendant. *Supplemental Agreement Between Kemper and PLC.*

MGM, and Kemper. Non-MGM defendants are further subdivided into "Group A" defendants and "Group B" defendants by reason of the PLC/Kemper agreements.

| NAME OF DEFENDANT | ALLEGATIONS | STATUS | DISPOSITION | DATE | SETTLEMENT AMOUNT |
|---|---|---|---|---|---|
| 1. Adams Elevator Equipment | Supplier-Elevator System-Electronic Call Button | Non-MGM ("A") | Not Settled | | |
| 2. Advance Mechanical, Inc. | Contractor-Seismic Joint | Non-MGM ("A") | Settled | 01/04/83 | $500,000.00 |
| 3. Air Balance Co., Inc. | Inspector-Heating Ventilation and Air-Conditioning ("HVAC") System | Non-MGM ("A") | Settled | 01/04/83 | $500,000.00 |
| 4. Alarmco, Inc. | Contractor-Fire Alarm System | Non-MGM ("A") | Settled | 05/10/83 | $300,000.00 |
| 5. Albert Van Luit & Co., Inc. | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Settled | 05/18/83 | $ 67,500.00 |
| 6. American Motorists Insurance Co., a subsidiary of Kemper Corporation | Inspector-Fire Property Insurance | Kemper | Settled | 12/29/82 | |
| 7. American Multiplex Systems, Inc. | Contractor-Watchmen's Tour Alarm | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 8. American Protection Insurance Co., a subsidiary of American Motorists Insurance Co. | Inspector-Fire Property Insurance | Kemper | Settled | 12/29/82 | |
| 9. American Society for Testing & Materials | Inspector-Plastic Coated Wiring and Aluminum Conduit | Non-MGM ("A") | Not Settled | | |
| 10. Amfac Distribution Corp., d/b/a Amfac Electrical Supply Co., Inc. | Supplier-Electrical Conduit and Wire | Non-MGM ("A") | Not Settled | | |
| 11. Apache Plastics, Inc., a subsidiary of Apache Corporation, and successor in interest to defendants Kerona Plastic Extrusion Company, Inc. and Kerona, Inc. | Supplier-Plastic Pipe | Non-MGM ("B") | Not Settled | | |
| 12. Bally Distributing Co. | Supplier-Plastic Gaming Products | Non-MGM ("A") | Settled | 03/08/83 | $200,000.00 |
| 13. Bally Manufacturing Corp. | Manufacturer-Plastic Gaming Products | Non-MGM ("A") | Not Settled | | |
| 14. Barber-Colman, Inc. | Supplier-Room Grilles for HVAC System | Non-MGM ("A") | Not Settled | | |
| 15. B & M Air Balance | Inspector-HVAC System | Non-MGM ("A") | Settled | 05/23/83 | See Precision-aire, Inc. |
| 16. Cadillac Plastic and Chemical Company | Supplier-Plastic Products | Non-MGM ("A") | Not Settled | | |
| 17. California Electric Construction Co. | Contractor-Electrical Wiring | Non-MGM ("A") | Settled | 01/27/83 | $10,000,000.00 |
| 18. Clark County, subdivision of the State of Nevada | Inspector-Fire Code Violations | Non-MGM ("A") | Settled | 02/25/83 | $ 2,500,000.00 |
| 19. Clark County Fire Equipment, Inc. | Contractor-Alarm System | Non-MGM ("A") | Not Settled | | |
| 20. Clark County Fire Protection District, subdivision of the State of Nevada | Inspector-Fire Code Violations | Non-MGM ("A") | Settled | 02/25/83 | See Clark County |
| 21. Cohama, Inc. | Supplier-Vinyl Products | Non-MGM ("A") | Not Settled | | |

| | NAME OF DEFENDANT | ALLEGATIONS | STATUS | DISPOSITION | DATE | SETTLEMENT AMOUNT |
|---|---|---|---|---|---|---|
| 22. | Columbus Coated Fabric, Inc. | Supplier-Vinyl Fabric | Non-MGM ("B") | Not Settled | | |
| 23. | Continental Mechanical Corp. | Contractor-HVAC System | Non-MGM ("A") | Settled | 02/11/83 | $10,250,000.00 |
| 24. | Corona Plastic | Supplier-Plastic Products | Non-MGM ("B") | Dismissal | 06/23/83 | |
| 25. | Corona Plastics | Supplier-Plastic Products | Non-MGM ("B") | Dismissal | 06/23/83 | |
| 26. | C. R. Laurence Co., Inc. | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Not Settled | | |
| 27. | Crystals and Oils Decorators Supply Corporation | Supplier-Crystal Chandeliers and Light Fixtures | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 28. | C. W. Stockwell, Inc. | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Settled | 05/24/83 | $50,000.00 |
| 29. | Dan Cashdan & Associates | Engineer-Seismic Joint | Non-MGM ("A") | Not Settled | | |
| 30. | Dash Industries, Inc. formerly known as David & Dash | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Settled | 05/19/83 | $75,000.00 |
| 31. | Del E. Webb Corp. | Contractor-Remodeling and New Addition | Non-MGM ("A") | Not Settled | | |
| 32. | Delta T | Inspector-HVAC System | Non-MGM ("A") | Settled | 05/20/83 | $60,000.00 |
| 33. | Don Schmitt | Interior Decorator | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 34. | Dunn Edwards Corporation | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 35. | Duo Flex Corp. | Contractor-Installed Casino Ceiling Tile | Non-MGM ("B") | Not Settled | | |
| 36. | Dynalectric Vegas Valley Co. | Contractor-Electrical Wiring | Non-MGM ("A") | Settled | 05/12/83 | $125,000.00 |
| 37. | E. I. DuPont de Nemours & Co., Inc. | Supplier-Plastic Products | Non-MGM ("B") | Not Settled | | |
| 38. | Electrical Testing Laboratories | Inspector-Electrical Equipment | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 39. | Elsters, Inc. d/b/a Lanco Supreme | Supplier-Fan Coil Units for HVAC System | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 40. | Essex Chemical Corp. | Supplier-Adhesive Mastic for Casino Ceiling Tile | Non-MGM ("B") | Not Settled | | |
| 41. | Fabricon Products | Supplier-Vinyl Coverings | Non-MGM ("A") | Not Settled | | |
| 42. | Fairfax Electronics, Inc. | Contractor-Fire Alarm System | Non-MGM ("A") | Not Settled | | |
| 43. | Familian Corp. | Supplier-Plastic Plumbing Pipe | Non-MGM ("A") | Settled | 02/11/83 | $1,200,000.00 |
| 44. | Fred Benninger | Owner and Operator of Hotel | MGM | Settled | 01/03/83 | See MGM |
| 45. | Frigitemp Corp., successor in interest to Samson West Corp. | Supplier-Foam Products | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 46. | General Felt Products of California, Inc. | Supplier-Animal Hair Carpet Pads | Non-MGM ("A") | Settled | 06/06/83 | $175,000.00 |
| 47. | General Tire & Rubber Company | Supplier-Vinyl Wall Covering | Non-MGM ("B") | Not Settled | | |
| 48. | Governair | Supplier-Controls for HVAC System | Non-MGM ("A") | Settled | 02/10/83 | See Temtrol, Inc. |
| 49. | Grand Reservation Service, Inc. | Owner and Operator of Hotel | MGM | Settled | 01/03/83 | See MGM |
| 50. | Grand Resorts, Inc. | Owner and Operator of Hotel | MGM | Settled | 01/03/83 | See MGM |

| | NAME OF DEFENDANT | ALLEGATIONS | STATUS | DISPOSITION | DATE | SETTLEMENT AMOUNT |
|---|---|---|---|---|---|---|
| 51. | Graybar Electric Supply, Inc. | Supplier-Aluminum Conduit and Plastic Coated Wiring | Non-MGM ("A") | Partial Settlement (Alflex Corporation) | 05/11/83 | $3,500,000.00 |
| 52. | Heitman and Associates formerly L. H. Antoine and Associates | Engineer-Curtainwall | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 53. | H. J. Lohrman and Associates | Engineer-Mechanical Design | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 54. | Imperial Glass Co. | Contractor-Curtainwall | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 55. | J. Josephson, Inc. | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Not Settled | | |
| 56. | Joel Bergman | Architect | Non-MGM ("A") | Settled | 01/11/83 | See Martin Stern |
| 57. | Johnson Controls, Inc. | Contractor-HVAC System | Non-MGM ("A") | Not Settled | | |
| 58. | Kemper Corporation, a subsidiary of Lumbermens Mutual Casualty Co. | Inspector-Fire Property Insurance | Kemper | Settled | 12/29/82 | |
| 59. | Kerona, Inc. | Manufacturer-Plastic Plumbing Pipe | Non-MGM ("B") | Not Settled | | |
| 60. | Kerona Plastic Extrusion Company, Inc. | " | " | " | | |
| 61. | Kirk Kirkorian | Owner and Operator of Hotel | MGM | Settled | 01/03/83 | See MGM |
| 62. | Lawless Brothers, Inc., d/b/a Lawless Detroit Diesel | Supplier-Auxiliary Generator | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 63. | Lear Siegler, Inc. d/b/a Rink Division | Supplier-Duct Work for HVAC System | Non-MGM ("A") | Not Settled | | |
| 64. | Lumbermens Mutual Casualty Co., d/b/a Kemper Group, Kemper Insurance Group, Kemper Insurance and Kemper Insurance Companies | Inspector-Fire Property Insurance | Kemper | Settled | 12/29/82 | |
| 65. | 3 M Company | Supplier-Foam Products | Non-MGM ("A") | Not Settled | | |
| 66. | Martin Stern, Jr. | Architect | Non-MGM ("A") | Settled | 01/11/83 | $1,400,000.00 |
| 67. | Martin Stern, Jr., d/b/a A.I.A. Architects and Associates | " | " | " | " | " |
| 68. | Mason Electric Company | Contractor-Electrical Systems | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 69. | Master Protection Enterprises, successor in interest to Clark County Fire Equipment, Inc. | Contractor-Alarm System | Non-MGM ("A") | Not Settled | | |
| 70. | Metro-Goldwyn-Mayer, Inc. | Owner and Operator of Hotel | MGM | Settled | 01/03/83 | $75,000,000.00 |
| 71. | MGM Grand Hotel, Inc. | " | " | " | " | " |
| 72. | MGM Grand Hotels, Inc. | " | " | " | " | " |
| 73. | MGM Grand Hotel-Las Vegas, Inc. | " | " | " | " | " |
| 74. | Miles R. Nay, Inc. | Contractor-Plumbing and Fixtures | Non-MGM ("A") | Settled | 01/25/83 | $1,250,000.00 |
| 75. | Nay Mechanical, Inc. | " | " | " | " | " |
| 76. | Nay Plumbing Co. | Contractor-Plumbing and Fixtures | Non-MGM ("A") | Dismissal | 06/23/83 | |

| NAME OF DEFENDANT | ALLEGATIONS | STATUS | DISPOSITION | DATE | SETTLEMENT AMOUNT |
|---|---|---|---|---|---|
| 77. Nibco, Inc. successor in interest to or formerly known as Yardley Pipe | Supplier-Plastic Pipe | Non-MGM ("A") | Not Settled | | |
| 78. Niederhauser Ornamental & Metal Works Co., Inc. | Contractor-Seismic Joint | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 79. Northrop Architectural Systems | Contractor-Curtainwall | Non-MGM ("A") | Settled | 02/10/83 | $500,000.00 |
| 80. N.W.S. Construction Corp., Inc. | Contracting-Venting for Elevators | Non-MGM ("A") | Settled | 01/12/83 | $450,000.00 |
| 81. N.W.S., Inc. | Contracting-Venting for Elevators | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 82. Olson Glass Co., Inc. | Contractor-Plastic Panels | Non-MGM ("B") | Not Settled | | |
| 83. Owens Corning Fiberglas Corp. | Supplier-Foam Insulation | Non-MGM ("B") | Not Settled | | |
| 84. Orvin Engineering Co. | Contractor-Fire Sprinklers | Non-MGM ("A") | Settled | 03/07/83 | $300,000.00 |
| 85. Otis Elevator Company | Contractor-Elevator System | Non-MGM ("A") | Settled | 03/08/83 | $7,500,000.00 |
| 86. Pari Craftsmen, Inc. | Contractor-Vinyl Wall Covering and Painting | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 87. Precisionaire, Inc., successor in interest to B & M Air Balance | Inspector-HVAC System | Non-MGM ("A") | Settled | 06/23/83 | $125,000.00 |
| 88. Pyrotronics, a division of Baker Industries, Inc. | Contractor-Fire Alarm System | Non-MGM ("A") | Not Settled | | |
| 89. QRS Neon Corporation | Supplier-Keno Board | Non-MGM ("A") | Settled | 05/17/83 | $60,000.00 |
| 90. Ralph Anderson Company | Contractor-Installed Doors | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 91. Ralph E. Phillips, Inc. | Design Services and Specifications | Non-MGM ("A") | Settled | 01/11/83 | $60,000.00 |
| 92. Ram Products Company | Supplier-Plastic Products | Non-MGM ("A") | Settled | 03/07/83 | $500,000.00 |
| 93. Richard A. Hunter, d/b/a RAH Construction Co. | Contractor-Remodeling | Non-MGM ("A") | Settled | 02/09/83 | $500,000.00 |
| 94. Richard S. Hatfield, Inc. d/b/a Norm's Refrigeration and Ice Equipment, d/b/a Norm's Refrigeration, Inc. | Contractor-Refrigeration Equipment in Delicatessen | Non-MGM ("A") | Settled | 01/12/83 | $500,000.00 |
| 95. Rink Division | Inspector-HVAC System | Non-MGM ("A") | Not Settled | | |
| 96. Roberts Electric | Contractor-Electrical Systems | Non-MGM ("A") | Settled | 01/12/83 | $100,000.00 |
| 97. Rohm and Haas | Supplier-Plastic Products | Non-MGM ("B") | Not Settled | | |
| 98. Samson West Corp. | Supplier-Foam Products | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 99. Sav-Mor Upholstery Supply | Supplier-Vinyl Products | Non-MGM ("B") | Not Settled | | |
| 100. Schneider, Inc., formerly known as Schneider Sheet Metal, Inc. | Contractor-HVAC System | Non-MGM ("A") | Not Settled | | |
| 101. Simpson Timber Co. | Supplier-Casino Ceiling Tile | Non-MGM ("B") | Settled | 04/28/83 | $9,400,000.00 |
| 102. Southwest Air Conditioning, Inc. | Contractor-Sheet Metal for HVAC System | Non-MGM ("A") | Settled | 01/12/83 | $250,000.00 |
| 103. Standard Cabinet Works, Inc. | Contractor-Plastic Products | Non-MGM ("A") | Settled | 01/04/83 | $500,000.00 |

| | NAME OF DEFENDANT | ALLEGATIONS | STATUS | DISPOSITION | DATE | SETTLEMENT AMOUNT |
|---|---|---|---|---|---|---|
| 104. | Supreme Metal Fabricators | Contractor-Kitchen Equipment | Non-MGM ("A") | Dismissal | 06/23/83 | |
| 105. | Taylor Construction Company | General Contractor | Non-MGM ("A") | Settled | 01/15/83 | $5,500,000.00 |
| 106. | Taylor International Corp. | " | " | " | " | " |
| 107. | Taylor of Nevada, Inc. | " | " | " | " | " |
| 108. | Temtrol, Inc. | Supplier-Controls for HVAC System | Non-MGM ("A") | Settled | 02/10/83 | $500,000.00 |
| 109. | Thorpe Insulation | Contractor-Insulation and Duct Work-HVAC System | Non-MGM ("A") | Settled | 03/08/83 | $300,000.00 |
| 110. | Tracinda Corporation | Owner and Operator of Hotel | MGM | Settled | 01/03/83 | See MGM |
| 111. | United States Elevator Corporation | Maintenance-Elevator System | Non-MGM ("A") | Not Settled | | |
| 112. | United Technologies Corp. | Contractor-Elevator System | Non-MGM ("A") | Settled | 03/08/83 | See Otis Elevator Co. |
| 113. | Wall-Pride, Inc. | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Settled | 05/11/83 | $85,000.00 |
| 114. | W. A. Perry Tile and Marble Company | Contractor-Ceramic Tile and Mastic | Non-MGM ("A") | Settled | 01/04/83 | $500,000.00 |
| 115. | Winfield Design Associates, Inc. | Supplier-Vinyl Wall Covering | Non-MGM ("A") | Settled | 05/11/83 | $50,000.00 |
| 116. | W. J. Thompson, Inc. | Contractor-Plaster, Drywall and Fireproofing | Non-MGM ("A") | Settled | 03/04/83 | $2,725,000.00 |
| 117. | Wilkinson Company, Inc., d/b/a Wilkinson Chutes, Inc. | Contractor-Laundry Chutes | Non-MGM ("A") | Settled | 02/10/83 | $500,000.00 |
| 118. | Yardley Pipe | Supplier-Plastic Pipe | Non-MGM ("A") | Not Settled | | |
| | | | | | TOTAL | $138,057,500.00 |

The total amount of the settlements are $138,057,500.00, of which $75,000,000.00 is from MGM and $63,057,500.00 is from non-MGM defendants. All total, sixty defendants have settled, thirty-seven defendants have not settled, and twenty-one defendants have been dismissed by Order of Court.

Twenty death cases and approximately two thousand personal injury and property damage claims were previously settled for $30,000,000.00. The "global settlement" encompasses all of the remaining sixty-seven death cases, one thousand twenty-one personal injury, and approximately $8,000,000.00 worth of property damage, business loss and subrogation claims. The total number of plaintiffs' releases under the global settlement is one thousand three hundred fifty-seven. The total value of the "global settlement" allocated to these claims for purposes of this settlement is $134,847,992.00. Of this amount, $92,388,175.00 is allocated to the sixty-seven death claims, $40,518,282.00 is allocated to the one thousand twenty-one personal injury claims,

and $1,991,535.00 is allocated to the property damage and business loss claims.

On May 6, 1983, settling defendants filed a joint motion for approval of settlements. Joinders to that motion were timely filed by defendants who settled after that date. Affidavits in support of the "good faith" of each settlement pursuant to N.R.S. 17.245 have been filed with the Court. On June 6 and 7, 1983, a hearing was held. Affidavits and memorandum in opposition to the joint motion for approval of settlements were filed both before and after the hearing.

## II. MOTION TO DISQUALIFY

Non-settling defendants contend that this Court should either disqualify itself, pursuant to 28 U.S.C. §§ 455(a) and 455(b)(1) and Canons 3 A(4), 3 C(1) and 3 C(1)(a) of the American Bar Association Code of Judicial Conduct from hearing and determining the good faith of the proposed settlements between the plaintiffs and settling defendants under N.R.S. 17.245 or, in the alternative, appoint another federal dis-

trict court judge as Special Master to hear these issues and make such a good faith determination. Non-settling defendants contend that this Court is predisposed to favor the settlements because the Court "as the architect of the extensive settlement negotiations, gained personal, extrajudicial knowledge of disputed evidentiary facts concerning the instant litigation, including unchallenged and unsubstantiated ex parte evidence not filtered through the usual trial process." *Motion of Cadillac Plastic and Chemical Company to Disqualify*, at 2.

Section 455, 28 U.S.C. provides in relevant part:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> > (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; ...

Further, Canon 3 C(1) of the American Bar Association Code of Judicial Conduct provides:

> A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings; ...

The applicable test for impartiality under section 455(a) is whether or not "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Winston,* 613 F.2d 221, 222 (9th Cir.1980). Section 455(b)(1) may alternatively require recusal in situations where the judge has pre-trial knowledge of the facts, independent of any possible bias or partiality, when the information is derived from an *extra-judicial source. United States v. Winston, supra; Shore v. County of Mohave, State of Ariz.,* 644 F.2d 1320, 1322 (9th Cir.1981). Non-settling defend-ants present two arguments in support of disqualification: (1) the impartiality of the Court might reasonably be questioned given the involvement by the Court in the settlement process, and (2) the Court has personal knowledge of disputed evidentiary facts concerning these proceedings.

■ Under all the facts and circumstances made a part of the record and known to the Court, the motion for disqualification must be denied on both grounds. Following a hearing on March 9 and 10, 1982, in Los Angeles, California, the parameters of possible settlement were first explored. On March 25, 1982, defendants met with the Court in Philadelphia, Pennsylvania, and outlined the basic principles of a "global settlement." When it became apparent to the Court and the parties that there would be a need to explore the relative culpabilities of the defendants for purposes of determining allocations for a settlement fund, the Court immediately appointed Richard R. Rogan, Esquire, as the Settlement Coordinator in order to avoid learning any of the facts or theories of liability before trial. The Settlement Coordinator met individually with the defendants and at no time was the Court involved except to receive generalized reports from Mr. Rogan as to the amounts of contributions received from defendants and the total amount of the general fund. The Court was never made aware of the particularized facts or theories of liability and never addressed respective apportionments for settlement. Mr. Rogan met with defendants from June 6, 1982, to December 27, 1982, and, thereafter, the PLC negotiated individually with the defendants. When the Court met with the individual plaintiff attorneys, the Court did so only in assessing what would be a fair settlement value for the claim in terms of compensatory damages. No theories or aspects of liability against defendants were discussed. Following settlements by defendants, both MGM and non-MGM, the Court entered stay orders on discovery with the understanding that a "good faith" hearing would be held, at which time all defendants could comment on the proposed settle-

ments. The "good faith" language in the stay orders was only to state good cause to stay further discovery and proceedings against settling defendants and at no time constituted a ruling on whether the settlements were in fact in good faith, which could only be decided after a full opportunity for all defendants to comment on the settlements and only after a full hearing on the issues.

Under Rule 16 of the Federal Rules of Civil Procedure, the Court is required to conduct necessary pre-trial procedures to facilitate preparation for trial and "such other matters as may aid in the disposition of the action." Such pre-trial procedures include the exploration of possible settlement. Manual for Complex Litigation, § 1.21 (1982 ed.) ("In order to produce a climate in which counsel may explore the possibility of early settlement, the judge should ask the views of counsel on the possibility of settlement at the first principal pretrial conference."). Moreover, Rule 16 of the Federal Rules of Civil Procedure has been amended, effective August 1, 1983, so as to expressly provide as follows:

> Rule 16. Pretrial Conferences; Scheduling; Management
>
> (a) PRETRIAL CONFERENCES; OBJECTIVES. In any action, the court may in its discretion direct the attorneys for the parties and any unrepresented parties to appear before it for a conference or conferences before trial for such purposes as
>
> .    .    .    .    .
>
> (5) facilitating the settlement of the case.

It would be incomprehensible to suggest that a court be disqualified every time it explores settlement of a case which it is required to do under the Federal Rules. In this case the Court explored the general principles of a "global settlement." A Settlement Coordinator was specifically appointed to explore the particulars of the settlement and the Court was not involved in that process. Moreover, the Court was not involved in the negotiations between the individual defendants and the PLC before settlement agreements were reached.

In addition, no extrajudicial information was received by the Court. In assessing the individual valuations for plaintiffs' claims, the Court reviewed answers to interrogatories, physicians' reports, medical bills, wage loss statements, and income tax returns of the claimants, all of which are already part of the record or are to constitute exhibits at trial. No extrajudicial information was communicated to the Court which the defendants do not already have or will have after an exchange of exhibits. The Court acted properly and well within its authority to hear the settlement *demands* of plaintiffs. This type of conduct occurs every day. Finally, non-settling defendants contend that the Court received extrajudicial information about MGM's insurance coverage because of a report filed by Dean Emmett J. Vaughan of the University of Iowa, and Dean W. Page Keeton of the University of Texas. This report was a direct result of a motion filed by plaintiffs to learn the particulars of the retroactive insurance purchased by MGM. The two experts were selected by plaintiffs and MGM and the report has been filed and is a part of the public record. Thus, no extrajudicial information was communicated to the Court. For these reasons, the motion to disqualify must be denied.

## III. REQUEST FOR JURY TRIAL

Non-settling defendants contend that the Court cannot hear the parties with respect to the good faith issue and that the good faith of each settlement must be tried by a jury.

■ Contribution and indemnity are rights in equity and not in law. 18 Am. Jur.2d *Contribution* § 4, at 10–14 (1965). There is no right to a jury trial when the relief sought is that of equity. *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). N.R.S. 17.245 was enacted to encourage settlements by discharging all liability for contribution by a settling tortfeasor to others upon a finding that the settlement was entered in "good faith." A non-settling tortfeasor is protected, however, under N.R.S. 17.245 because

the non-settling defendant receives a credit in the amount contributed by the settling defendant in any subsequent verdict against that defendant. N.R.S. 17.245(1). In order to further protect the non-settling defendant, the Court must find that the settlement was in "good faith."

■ Non-settling defendants have failed to cite any direct authority to support this proposition that they are entitled to a jury trial on the issue of "good faith." Statements found in *Lareau v. Southern Pacific Transportation Co.,* 44 Cal.App.3d 783, 798 n. 14, 118 Cal.Rptr. 837, 846 n. 14 (1975) to the effect that there is a right to jury trial are mere dictum and were not issues decided by the Court. To the contrary, Cal.Civ. Proc.Code § 877.6, effective 1980, provides that a hearing on the issue of the good faith of a settlement shall be held before trial and that "[t]he issue of the good faith of a settlement *may be determined by the court* on the basis of affidavits served with the notice of hearing, and any counter-affidavits filed in response thereto, *or the court may, in its discretion,* receive other evidence at the hearing." (Emphasis added). That statute makes no reference to a right to jury trial on the issue of good faith. Non-settling defendants cite *Palmer v. United States,* 652 F.2d 893 (9th Cir.1981) and *In re N–500L Cases,* 691 F.2d 15 (1st Cir.1982) for the proposition that they are entitled to a jury trial on this issue. However, those cases held that there is a right to jury trial on the issue of liability and the recovery of damages through indemnity or contribution. *Palmer* and *In re N–500L Cases* never addressed the issue of whether there is a right to a jury trial at a hearing to determine whether certain settlements were in "good faith" under a contribution statute such as N.R.S. 17.245.

There is no right to a jury trial under N.R.S. 17.245 because the issue of "good faith" and the amount of a credit to which a non-settling defendant would be entitled is one of "equity" for which there is no right to trial by jury. The policy of encouraging settlements under N.R.S. 17.245 would be impaired if multiple trials by jury would have to be held in order to determine whether a settlement was in "good faith." A non-settling party is fully protected by its ability to present counter-affidavits or evidence at a hearing on the issue of "good faith." For these reasons, there is no right to a jury trial under N.R.S. 17.245.

## IV. MOTIONS FOR APPROVAL OF SETTLEMENTS

■ Settling defendants have moved for a good faith determination because of the benefits accorded under N.R.S. 17.245. That statute provides:

17.245 Release or covenant not to sue; effect. *When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:*

1. It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

2. *It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.*

(Emphasis added). Pursuant to N.R.S. 17.-245, a "good faith" settlement by a tortfeasor establishes an affirmative defense to any claims for contribution by another joint tortfeasor found liable for damages to plaintiff. A right of indemnity "under existing law" is not, however, impaired. N.R.S. 17.265. *See Reid v. Royal Insurance Company,* 80 Nev. 137, 390 P.2d 45 (1964). Factors to be considered by the Court in assessing whether a settlement is in good faith is the amount paid in settlement, the allocation of the settlement proceeds among plaintiffs, the insurance policy limits of settling defendants, the financial condition of settling defendants, and the existence of collusion, fraud or tortious conduct aimed to injure the interests of non-settling defendants. *Commercial Union Ins. Co. v. Ford Motor Co.,* 640 F.2d 210 (9th Cir.1981). As noted by the California Court of Appeals in

*River Garden Farms, Inc. v. Superior Court for County of Yolo,* 26 Cal.App.3d 986, 996, 103 Cal.Rptr. 498, 505 (1972): "Any negotiated settlement involves cooperation, but not necessarily collusion. It becomes collusive when it is aimed to injure the interests of an absent tortfeasor." Moreover, "[t]he price of a settlement is the prime badge of its good or bad faith." *Id.*

### (A) MGM

■ In the present case, MGM settled in the amount of $75,000,000.00. This amount does not cover the ten employee death claims and twenty-one employee personal injury claims, which total $5,123,500.00 by reason of the bar to suit under the Nevada Workmen's Compensation Act. In addition, this amount does not cover any actions by lessees at the MGM or subrogees of such lessees against which MGM has releases or a written waiver of rights. In return for the $75,000,000.00 settlement, MGM has been released by all remaining plaintiffs' claims under the "global settlement." In addition, MGM had previously expended approximately $30,000,000.00 in settling twenty other death cases and approximately two thousand minor personal injury and property claims.[2] The total amount of insurance coverage held by MGM was $200,000,000.00. The initial layer of $30,000,000.00 was exhausted in "pre-global settlements." The remaining layers of the $170,000,000.00 in insurance coverage were purchased from Frank B. Hall & Co., Inc. as retroactive insurance. *See* Reports of Dean W. Page Keeton and Dean Emmett J. Vaughan. MGM, as the owner of the MGM Grand Hotel/Casino, was primarily responsible in terms of potential liability. As further consideration for settlement, MGM has agreed to release non-MGM settling defendants for claims of indemnity and contribution both for global and pre-global settlements. In addition, MGM has agreed to provide an indemnification for compensatory damage

claims above a threshold of $2,142,500.00 to the "Indemnified Six" who are defendants who have contributed all or near their policy limits, *MGM Indemnification to the Indemnified Six* (April 29, 1983); and an indemnification to all settling defendants, except Del E. Webb Corporation and any defendant not released by Kemper, for compensatory damage claims filed by non-settling plaintiffs, *MGM Indemnification to Settling Defendants* (April 29, 1983). Under all these facts and circumstances, and due to the extensive arms-length negotiations entered into between MGM and the PLC which have been testified to and set forth in the affidavits, the Court finds that the MGM settlements are in "good faith" and that they, thus, bar any non-settling defendant from a claim of contribution against MGM pursuant to N.R.S. 17.245 in return for a credit.

### (B) Non-MGM—"Group A"—Indemnified Six

■ Six defendants contributed their policy limits or near their policy limits. Taylor Construction Company, the managing contractor during the construction of the hotel and casino in 1972 to 1974, contributed its liability policy limit of $5,500,000.00. Taylor Construction reserved, however, $250,000.00 under a separate property damage policy for any unforeseen claims and continuing attorneys' fees and costs. Similarly, Continental Mechanical Corporation, the general mechanical contractor responsible for the heating, ventilation and air-conditioning system which contributed to the distribution of the smoke throughout the high-rise tower, contributed its policy limit of $10,750,000.00 but reserved $500,000.00 to pay its reasonable attorneys' fees, costs and expenses in participating in the defense of any unsettled claims. Continental Mechanical Settlement Agreement, ¶ 4. Any amounts remaining under the $500,000.00

---

2. On March 22, 1982, the Court approved an Order of Settlement in the amount of $13,152,700.00 for nine death claims and one hundred fifty-two personal injury claims. Pretrial Order No. 101. Four other death cases and numerous personal injury cases, under the jurisdiction of

this Court, were settled prior to September 21, 1981, and approved by this Court. Finally, seven unfiled death cases and numerous unfiled and state court personal injury claims were settled by MGM.

escrow fund after Continental Mechanical, in its sole and absolute discretion, has satisfied itself that no further defense costs will be incurred, will be paid over to plaintiffs together with an accounting of monies spent. *Id.* Martin Stern, Jr., d/b/a A.I.A. Architects and Associates, the general architect during the construction of the hotel and casino, contributed $1,400,000.00 to the settlement fund, which constituted the remainder of a $3,000,000.00 self-consuming insurance policy. Similarly, Ralph Phillips, Inc., which provided design services and specifications, contributed $60,000.00, which constituted the remainder of a $250,000.00 self-consuming insurance policy. W.J. Thompson, Inc., the general contractor responsible for the plaster, drywall and fireproofing, contributed $2,725,000.00 of a $3,500,000.00 policy. The remainder of that policy was reserved because of the potential liability arising from separate lawsuits filed as a result of a fire at the Las Vegas Hilton Hotel and Casino in Las Vegas, Nevada, during the same time period. Richard S. Hatfield, Inc., d/b/a Norm's Refrigeration, which installed a compressor near the source of the ignition of the fire in the delicatessen, contributed its policy limit of $500,000.00.

In consideration of the fact that each of these defendants contributed all or near their policy limits, the PLC agreed to reserve approximately ten percent (10%), or $2,142,500.00, in a segregated account to pay settlements or judgments against the indemnified six outside of the "global settlement" from unfiled claims. Any amounts paid above this threshold fund will be indemnified by MGM. *MGM Indemnification to the Indemnified Six* (April 29, 1983). The good faith character of these settlements is readily demonstrated by the extensive arms-length negotiations between each of these defendants in seeking protection because of their contributions of either all or near their policy limits. Moreover, the good faith character of the settlements is more readily made apparent by the inability of the PLC to collect the remainders of these policies until the PLC could provide the required protection in the form of a

Kemper release and an indemnity from MGM. The need to have these side agreements and indemnities was a direct result of each settling defendant's demand for a "global settlement" and an end to all litigation. Under all of these facts and circumstances, the Court finds that each of the settlements was entered into in good faith and that a non-settling defendant is barred from seeking contribution against these defendants.

(C) Remainder of Non-MGM Defendants —"Group A"

(1) Fire Origin

■ California Electric Construction Company, the prime electrical contractor during the construction of the hotel and casino and against whom liability was asserted because the ignition of the fire in the delicatessen was alleged to be electrical in nature, contributed $10,000,000.00 to the settlement fund. Alflex Corporation, a third-party defendant named by Graybar Electric Supply, Inc., the latter of which contracted to supply electrical supplies to California Electric, contributed $3,500,-000.00 to the settlement fund because it allegedly supplied the flexible aluminum conduit which provided an electrical short-circuiting and caused the ignition of the fire. Roberts Electric, an electrical subcontractor of California Electric, contributed $100,000.00 to the settlement fund. QRS Neon Corporation contributed $60,000.00 because it supplied a Keno board which was allegedly involved in the origin of the fire in the delicatessen. Dynaelectric of Nevada, Inc. contributed $125,000.00 because it installed the electrical wiring for the Keno board. Orvin Engineering Co. contributed $300,000.00 because the delicatessen and casino areas were not equipped with fire sprinklers, and Alarmco, Inc. contributed $300,000.00 because allegedly the fire alarm never sounded.

(2) Smoke Spread

Air Balance Co., Inc. and Precisionaire, Inc. contributed $500,000.00 and $125,000.00 respectively because of their alleged fail-

ures to discover certain defects in the HVAC system upon inspections after the HVAC's original construction which ultimately contributed to the heavy spread of smoke to the upper floors. Temtrol, Inc./Governaire contributed $500,000.00 because it furnished allegedly defective equipment and controls for installation in the HVAC system. Southwest Air Conditioning, Inc. contributed $450,000.00 because it allegedly installed the sheet metal for that system in a defective manner. Delta T contributed $60,000.00 because it allegedly failed to properly adjust the control dampers in the HVAC system. Wilkinson Company, Inc., d/b/a Wilkinson Chutes, Inc., contributed $500,000.00 because it allegedly failed to properly seal the laundry chutes which contributed to the heavy spread of smoke. Thorpe Insulation contributed $300,000.00 because it allegedly failed to furnish proper insulation for certain portions of the HVAC system.

Otis Elevator Company, a subsidiary of United Technologies Corp. and the general contractor responsible for the elevator and escalator systems, including the electronic touch button system allegedly activated by smoke and fire, contributed $7,500,000.00 to the settlement fund. Ten persons died because they were trapped in the elevators and large amounts of smoke spread through the elevator hoistways to the upper floors. N.W.S. Construction Corp., Inc. contributed $450,000.00 and Nay Mechanical, Inc. contributed $1,250,000.00 because they performed the plumbing work and allegedly failed to properly seal vertical pipe openings which contributed to the spread of smoke. Advance Mechanical, Inc. contributed $500,000.00 because it allegedly failed to properly seal the seismic joints, which allowed for expansion in case of an earthquake, between the three wings of the upper high-rise which allowed the smoke to spread to the upper floors. Northrop Architectural Systems contributed $500,000.00 because it allegedly improperly installed the curtainwall which constituted the outside wall under which smoke spread to the upper floors. Richard A. Hunter, d/b/a RAH Construction, contributed $500,000.00 be-

cause it allegedly cut a hole in the stairwell wall during remodeling before the fire which allowed the smoke to enter the stairwell and rise to the upper floors. Finally, Clark County and Clark County Fire Protection District contributed $2,500,000.00 because of their alleged failure to properly inspect and enforce the applicable fire code.

(3) Fire Spread and Toxic Smoke

Familian Corp. contributed $1,200,000.00 because it allegedly supplied plastic plumbing pipe which contributed to the rapid spread of fire and toxicity of smoke. Standard Cabinet Works, Inc., W.A. Perry Tile and Marble Company, and Ram Products Company contributed $500,000.00 each because they allegedly furnished and installed plastic and adhesive mastic products which contributed to the spread of fire and toxicity of the smoke. Bally Distributing Co. contributed $200,000.00 because it supplied plastic covered slot machines, tables and gaming products which provided fuel for the fire and contributed to the toxic nature of the smoke. General Felt Products of California, Inc. contributed $175,000.00 because it allegedly supplied carpet padding which emitted toxic gases when consumed by fire. Finally, Dash Industries, Inc., Albert Van Luit & Co., Inc., Winfield Design Associates, Inc. and C.W. Stockwell, Inc. contributed $75,000.00, $67,500.00, $50,000.00, and $50,000.00 to the settlement fund because they supplied vinyl wall coverings which contributed to the spread of fire and toxic nature of the smoke.

The total amount of these settlements, when coupled with the settlement of the indemnified six, for non-MGM "Group A" defendants is $53,657,500.00. Each of the settlements was negotiated after extended meetings with the Settlement Coordinator and the PLC. The settlements, upon examination, are fair and reasonable in terms of the amounts paid in settlement, the insurance policy limits of defendants, the financial condition of defendants and the relative degrees of anticipated liability. For these reasons, the Court finds that each of the non-MGM "Group A" settlements is in good faith and that non-settling defendants are

barred from seeking contribution against these defendants in return for a credit from any subsequent verdict.

(D) Simpson Timber Company—Non-MGM Defendant—"Group B"

■ Pursuant to the "Agreement for Releases and Settlement" and "Contract for a Common Plan of Litigation" between Kemper and PLC, there are twelve defendants, denominated as "Group B" defendants, which Kemper will not release because of its property subrogation claims filed against these defendants. *See American Protection Insurance Co. v. Apache Plastics, Inc., et al.*, MDL No. 453 (filed April 12, 1983). Simpson Timber Company is one of these twelve defendants. On April 28, 1983, Simpson Timber Company entered into a Settlement Agreement with plaintiffs for $9,400,000.00. Pursuant to that agreement, Simpson agreed to advance the PLC an additional $5,000,000.00 for purposes of payment to Kemper by the PLC pursuant to negotiations between Kemper and the PLC and a Supplemental Agreement between Kemper and PLC dated April 28, 1983. Pursuant to the Contract for a Common Plan of Litigation, Kemper was entitled to the first $10,000,000.00 received from "Group B" defendants because of the Kemper release provided to "Group A" defendants. That agreement was modified so as to allow the settlement between Simpson and the PLC. *See* Supplemental Agreement Between Kemper and PLC. Under the Simpson Settlement Agreement, the PLC has agreed to repay Simpson the $5,000,000.00 advance only if it receives settlement monies in excess of $140,000,000.00. In the event that plaintiffs do not receive settlement monies in excess of $140,000,000.00, then the plaintiffs are not required to pay back to Simpson the $5,000,000.00 advance. Simpson Settlement Agreement, ¶ 2 (April 28, 1983).

Non-settling defendants contend that the Simpson Agreement was not entered into in good faith because Kemper was paid $5,000,000.00 as a by-product of that agreement. The by-product was an advance made by Simpson of $5,000,000.00 to the PLC for the express purpose of allowing PLC to pay over to Kemper one-half of the $10,000,000.00 price tag Kemper placed on their release to "Group A" defendants. The point here is that a non-settling defendant is entitled to look to the $10,000,000.00 base line as the consideration for the Kemper release from which a non-settling defendant's pro rata share will be calculated. The arrangements between the PLC to advance monies to Kemper for the necessary release; the advance by Simpson to the PLC for that purpose, subject to repayment only if certain monies are recovered; and the other transactions between Simpson, PLC and Kemper on this matter have no effect on the amount of the credit against the $10,000,000.00 that every non-settling defendant will have by application of N.R.S. 17.245. Thus, non-settling defendants are not denied their right to a credit under N.R.S. 17.245 in respect to Kemper's *own* subrogation claim and, in addition, these same non-settling defendants will have available for an otherwise proper pro rata calculation for credit on their behalf concerning their claims against Simpson, the aggregate sum of $14,400,000.00, which is the total consideration paid by Simpson to the PLC for release of plaintiffs' claims against Simpson. The fact that the PLC allocated $5,000,000.00 of that for a necessary advance payment to Kemper does not affect the rights of non-settling defendants to seek credit measured against the full $14,400,000.00 paid by Simpson to the PLC. That is to say, the fact that Simpson, as part of its negotiating position, has agreed to risk never retrieving the $5,000,000.00 advance from the PLC does not reduce the credit level of $14,400,000.00 that a non-settling defendant is entitled to look to. Accordingly, a non-settling defendant is in no way prejudiced because of the advance, or whether there is ever a repayment of any of the advance or not, or whether a level of $140,000,000.00 in recoveries is ever reached or not. It is of no moment to a non-settling defendant. Those defendants can look to the maximum credit they may otherwise be entitled to despite the ultimate outcome of

this transaction between Kemper, PLC and Simpson.

Non-settling defendants further contend that the Simpson Agreement constitutes "champerty" and "maintenance" and that the obligation of the PLC to repay $5,000,-000.00 to Simpson in the event that total PLC settlements exceed $140,000,000.00 contravenes public policy encouraging settlements. "Maintenance exists when a person without interest in a suit officiously intermeddles therein by assisting either party with money or otherwise to prosecute or defend it." 14 C.J.S. *Champerty and Maintenance* § 1b. "Champerty is maintenance with the additional feature of an agreement for the payment of compensation or personal profit from the subject matter of the suit." 14 C.J.S. *Champerty and Maintenance* § 2. In *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (1971), the Nevada Supreme Court declared an agreement between plaintiff and two defendants, wherein the two defendants agreed to pay the sum necessary to bring the recovery up to $20,000.00 if the jury awarded less than $20,000.00 against the remaining defendant in return for plaintiff not executing against the defendants if the verdict exceeded $20,-000.00 and not opposing motions for directed verdicts in their favor at trial, to constitute champerty and maintenance and to be against public policy. *Lum* has been cited by non-settling defendants in support of their arguments that the Simpson agreement is similarly void. However, the facts of *Lum* and its decision are readily distinguishable from the facts of this case. First, in the instant case, Simpson paid $14,400,-000.00 to plaintiffs in settlement ($9,400,-000.00 to plaintiffs and a $5,000,000.00 advance for the PLC to pay to Kemper), for which non-settling defendants will receive their pro rata share of the credit in any subsequent verdict. The advance of $5,000,000.00 to the PLC by Simpson was made to the PLC so that the PLC could satisfy its own obligations to Kemper. Repayment is only predicated on the condition that the PLC receive settlements above a $140,000,000.00 limit. These facts are readily distinguishable from the facts of *Lum*

and, thus, do not render this agreement void. In *Lum,* the plaintiff was required to prosecute his actions against the remaining defendant and not settle without the two defendants' consent. 488 P.2d at 350. This is not so in the present case because Simpson has made no requirement that the PLC prosecute its action against remaining defendants or that plaintiffs obtain Simpson's prior consent for settlement. There is no officious intermeddling and no assistance by Simpson with money to help plaintiffs prosecute their suit against non-settling defendants. Moreover, there is no agreement for the payment of compensation to Simpson from the subject matter of the suit because there is no express requirement that the PLC prosecute its actions against the non-settling defendants and the PLC is free to not do so if it chooses. In addition, Simpson is still a defendant in the Kemper suit. Second, the court in *Lum* was concerned with the collusion at trial and the agreement by plaintiff and the defendants to attach the remaining defendant at trial. 488 P.2d at 351–353. In the instant case, there is no such agreement and no requirement that Simpson go to trial. Simpson need not appear at trial by reason of the settlement. Moreover, non-settling defendants receive their pro rata share of a credit in the full amount of $14,400,000.00 and, thus, their right to a credit under N.R.S. 17.245 is not compromised.

In addition, the Simpson agreement does not violate the principles of *Booth v. Mary Carter Paint Company,* 202 So.2d 8 (Fla. 1967) and its progeny. In *Mary Carter,* there was a sliding scale agreement based on the amount of the total recovery of which defendant would not be responsible for more than $12,500.00. If the recovery exceeded $37,500.00 against a defendant, then the defendant would not pay anything to plaintiff. 202 So.2d at 10. In *General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039 (1980), the court in discussing the definition of a "Mary Carter" agreement observed:

It is probably safe to say that no two pacts dubbed Mary Carter agreements

have been alike. However, three basic features seem to be contained in each: 1) The agreeing defendant is to remain a party and is to defend himself in court. However, his liability is limited by the agreement. In some instances this will call for increased liability on the part of other co-defendants. 2) The agreement is secret. 3) The agreeing defendant guarantees to the plaintiff that he will receive a certain amount, notwithstanding the fact that he may not recover a judgment against the agreeing defendant or that the verdict may be less than that specified in the agreement.

None of these factors for a *Mary Carter* agreement are met by the Simpson agreement. First, Simpson will not remain a defendant. Second, the agreement is a matter of public record. Third, while plaintiffs are guaranteed the receipt of $9,400,000.00, Simpson will not be at the trial and non-settling defendants receive their pro rata share of a $14,400,000.00 credit in any verdicts rendered against them by plaintiffs.

Finally, this agreement does not contravene the public policy of encouraging settlements. The PLC has every interest in negotiating future settlements because part of those future settlements will inure to the benefit of plaintiffs. The fact that there is no requirement that the $5,000,000.00 advance be repaid if no settlement monies were obtained above $140,000,000.00 was a direct result of skillful negotiations by the PLC and a means to prevent any potential liability if no further recoveries by settlement or judgment were made by the PLC. Rather, the PLC fully expects the sum total of the plaintiffs' settlement to exceed the amount of $145,000,000.00 by reason of their statements on the record that the PLC will continue to vigorously pursue further settlements against non-settling defendants or take the non-settling defendants to trial. For these reasons, and under all the facts and circumstances, the settlement of Simpson Timber Company was entered into in good faith and the settlement bars any claims for contribution by non-settling defendants in return for a credit in the amount of the settlement.

(E) Kemper Agreement

A precondition for any settlement by MGM was that there would be settlements from non-MGM defendants sufficient to establish the necessary funds to meet plaintiffs' claims. A precondition for any settlement by non-MGM defendants was that they, in addition to being released by all plaintiffs and MGM, also be released from the Kemper Insurance property subrogation claim. These concepts were the basic foundation for a "global settlement." At first, MGM negotiated with Kemper, as its property damage insurer, in an attempt to obtain these needed releases. This attempt failed. Secondly, non-MGM defendants attempted to negotiate with Kemper but were unable to secure the $10,000,000.00 demanded by Kemper in return for the Kemper releases. During these negotiations it was understood that certain defendants ("Group B" defendants), against which Kemper was about to file its lawsuit, would be excluded from the package. Unfortunately, this attempt failed. Finally, the PLC was able to negotiate a settlement with Kemper in which the needed Kemper releases would be secured in return for the first $10,000,000.00 received from joint recoveries against "Group B" defendants. In effect, Kemper agreed to postpone its receipt of the $10,000,000.00 by awaiting settlements or judgments against "Group B" defendants rather than demanding $10,000,000.00 from the general settlement fund. In return for this consideration and the sharing arrangements subject to future Court approval set forth in the Contract for a Common Plan of Litigation, Supplemental Agreement Between Kemper and PLC, and Second Supplemental Agreement Between Kemper and PLC, plaintiffs agreed to dismiss their claims against Kemper as a defendant. Agreement for Releases and Settlement, ¶ 5 (December 29, 1982). To protect plaintiffs' interests because of the uncertainty of whether a "global settlement" could be achieved and because of the question of whether a substantial number of non-MGM defendants would participate in

the creation of the settlement fund, it was provided that the dismissal would only take effect if $114,000,000.00 in present value dollars were recovered. *Id.* Nonsettling defendants have focused their attention on those agreements and have argued that the Kemper dismissal is not in good faith and that the Contract for a Common Plan of Litigation, as amended, is against public policy.

First, non-settling defendants contend that the absence of monetary consideration by Kemper for the dismissal of plaintiffs' claims calls into question the good faith of the settlement. Non-settling defendants argue that "while some cases examine amounts paid for releases to determine if they are 'disproportionately low,' no such examination need be made here since neither Kemper nor the other settling defendants paid any monetary consideration for such releases." This, however, is not true. The consideration to plaintiffs for the dismissal of Kemper as a defendant is the postponement by Kemper with respect to its entitlement of $10,000,000.00, the value of the Kemper releases to "Group A" defendants, to the first $10,000,000.00 of the total recoveries made by either Kemper or plaintiffs against "Group B" defendants. Further consideration is the fact that plaintiffs will receive the second $10,000,000.00 of the total of recoveries by either Kemper or plaintiffs from "Group B" defendants. Plaintiffs and Kemper will share equally in the next $60,000,000.00 of the total recoveries, plaintiffs will receive the next $10,000,000.00, and, finally, plaintiffs and Kemper will share equally in the remaining recoveries against "Group B" defendants. Second Supplemental Agreement, ¶ II. These sharing arrangements are anticipated by plaintiffs to result in an additional $70,000,000.00 recovery by plaintiffs if Kemper received a verdict or settlements for the full amount of the $141,000,000.00 property subrogation claim. Under these facts and circumstances, and due to the extensive arms-length negotiations between the PLC and Kemper, it cannot be said that these agreements were not entered into in "good faith." The fact that the value of the consideration cannot be measured at this time due to the complex sharing arrangements and the need to value the consideration of the postponement of the $10,000,000.00 receipt, which can only be accomplished after trial of many of the issues presented and the determination of which non-settling defendants are liable and what compensatory or punitive damages are to be awarded, does not mean that the settlement agreements between plaintiffs and PLC are not in good faith. Rather, the amount of the credit pursuant to N.R.S. 17.245 to which a non-settling defendant is entitled by reason of the Kemper dismissal must await future adjudication at trial after many of the issues which need to be decided will have been decided and a better value of the true consideration, *measured in dollars,* can be ascertained by reason of various findings of liability, awarding of damages, and sharing in recoveries both under Kemper's and plaintiffs' claims against "Group B" defendants. The key to the problem is that the amount of the credit under N.R.S. 17.245 can only be determined at a future date after trial. The value for the Kemper dismissal may be as high as $70,000,000.00. The fact that the amount of the credit is not known at this date cannot prevent the Court from examining and determining whether the settlement between Kemper and the PLC is in "good faith." When all the necessary issues have been litigated and decided, then and only then can the actual amount of the credit for each plaintiff, in return for the Kemper dismissal, be determined.

Second, non-settling defendants contend that the Kemper/PLC agreements are not in good faith because no value has been ascribed to the release by Kemper of "Group A" defendants in the property subrogation suit and that non-settling defendants have been deprived of their reduction in the property subrogation claim mandated by N.R.S. 17.245. This, however, is not true. Paragraph 3(d) of the Contract for a Common Plan of Litigation provides that the value of the Kemper releases to "Group A" defendants is $10,000,000.00. *See* Testi-

mony of Thomas M. Foulds, Esquire. The value for these Kemper releases was determined during Kemper's negotiations with non-MGM defendants and, thereafter, in negotiations with the PLC. Kemper is entitled to the first $10,000,000.00 recovery against "Group B" defendants because it furnished these releases to "Group A" defendants. For these reasons non-settling defendants in the Kemper subrogation claim are entitled to their pro rata credit share of the $10,000,000.00 consideration paid by Kemper to the PLC because of the release by Kemper of the "Group A" defendants. In exchange, any claims for contribution in the Kemper subrogation action against settling "Group A" defendants by non-settling defendants is barred under N.R.S. 17.245.

Non-settling defendants contend that, by reason of the nature of the PLC/Kemper contract, there is a danger that the PLC and Kemper can manipulate *future settlements* and misallocate the proceeds to the detriment of non-settling defendants. This danger, however speculative, does not mean that the settlement plan is void. Any misallocations of *future* settlements can be remedied at a future date when good faith determinations are sought by the future settling defendants. Thus, the *possibility* of collusion can be remedied at a future date.

Non-settling defendants contend that the Contract for a Common Plan of Litigation is void for champerty and maintenance and that the related settlement agreement is lacking in good faith. Non-settling defendants cite *Lum v. Stinnett, supra,* in support of that proposition. Non-settling defendants, however, miss the point. In *Lum v. Stinnett, supra,* the agreement was void for champerty and maintenance because it was between plaintiff and defendants. Moreover, that agreement was collusive, withheld from the jury, and in a manner which required that defendants benefit monetarily from their collusion against the non-settling

defendant. The present case is different. Kemper is a plaintiff and is asserting its own rights under the property subrogation action. Thus, plaintiffs, represented by the PLC, and Kemper as a *plaintiff* have agreed to share certain information and to cooperate in asserting their claims against "Group B" defendants. The assignments or sharing of settlement or judgment proceeds is not collusive because they are *both plaintiffs*.[3] There is no champerty or maintenance because each have common interests as plaintiffs. In addition, there is no officious intermeddling or a lack of interest in each other's lawsuit. Under these circumstances, the assignment of proceeds from settlements or judgments does not violate public policy. Plaintiffs hope that through their action they can obtain an additional $70,000,000.00 by reason of the sharing of Kemper proceeds. Plaintiffs and Kemper are both protected from any unjust results because any future sharing is conditioned upon *Court approval*. The formulas set forth in the Contract for a Common Plan of Litigation and the two Supplemental Agreements are only projections. Plaintiffs are further protected by reason that in the event plaintiffs recover against a certain "Group B" defendant but Kemper does not, there will be no sharing of proceeds between plaintiffs and Kemper. Second Supplemental Agreement Between Kemper and PLC, ¶ III.

The Court cannot project into the future, at this time, what recoveries will result. The determination of Court approval can only be made after all necessary facts are made known upon further settlements or trial. The fact that each and every fact is not now readily known does not prevent a finding of good faith at this juncture with respect to the PLC/Kemper contract. Moreover, the assignment of proceeds by PLC to Kemper from six of the "Group A" defendants, *see* Supplemental Agreement Between Kemper and PLC, ¶ 5 and Second Supplemental Agreement Between Kemper and PLC, ¶ II(f), is not void or against

---

**3.** *Adler v. Garcia*, 324 F.2d 483 (10th Cir.1983), cited by non-settling defendants, is also distin-     guishable on these grounds.

public policy because Kemper and the PLC are in a debtor-creditor relationship by reason of the $10,000,000.00 owed by plaintiffs to Kemper for the Kemper release on behalf of "Group A" defendants. This assignment is clearly valid under established principles of law.

Finally, non-settling defendants contend that the PLC/Kemper contract thwarts the policy of encouraging settlements because a defendant would be forced to settle with both and not with one or the other because a settling party would not want to put itself in a position of financing litigation against itself. This argument is without merit. Simpson Timber Company readily settled with plaintiffs but chose not to settle with Kemper. Each non-settling defendant must assess itself which claims it would be beneficial to settle before trial and which claims it should defend at trial. The PLC/Kemper contract does not interfere with the non-settling defendants' decision nor does it discourage a party to settle with one or the other.[4]

(F) Agreements to Withhold Information

■ Non-settling defendants contend that certain settlement agreements contain provisions resulting in the withholding of information which are "collusively designed to prevent the non-settling defendants, . . ., from adequately preparing their defense." Supplemental Opposition of Barber-Colman Company, at 8. Certain provisions of the settling agreements provide that the settling defendants will not voluntarily make their files available to non-settling defendants. California Electric Settlement Agreement, ¶ 3. The purpose of those provisions is to prevent settling defendants from selling their work product to other defendants. This provision is not collusive or aimed to injure non-settling defendants. Non-settling defendants can still resort to Rule 45 of the Federal Rules of Civil Procedure in order to obtain needed information from a settling defendant. For these reasons, this

challenge to the settlement agreements must be rejected.

## V. PLAINTIFFS' CLAIMS AND VALUES

■ A badge of a good faith settlement is the allocation among the plaintiffs. *River Garden Farms, Inc. v. Superior Court for County of Yolo*, 26 Cal.App.3d at 998, 103 Cal.Rptr. at 507. In the present case, settling defendants contributed to a general settlement fund to satisfy the claims of the one thousand three hundred fifty-seven claimants. The allocation of the settlement fund was not determined by settling defendants but rather by the plaintiffs. For these reasons, the test of the true value of the allocation of the settlement proceeds must await each plaintiffs' trial against the non-settling defendants. The good faith of the allocation can be determined at that time. Under the present formula, the total value of plaintiffs' claim is $134,847,992.00 under the "global settlement." *See* List of Plaintiffs' Settlement Valuations. The allocations among the plaintiffs is set forth in the list of plaintiffs' settlement valuations filed by the Court. Any receipt of settlement monies above the $134,847,992.00 figure will be shared pro rata based upon a formula determined by the valuation of the individual plaintiff's claim divided by $134,847,992.00. Expressed in algebraic terms, the formula is as follows:

$$\text{Pro rata \%} = \frac{\text{Value of Plaintiff's Claim}}{\$134,847,992.00}$$

Because additional monies through future settlements may inure to plaintiffs, the final amount of the credit under N.R.S. 17.245 cannot be determined until trial of the individual plaintiff's claim. This fact, however, does not prevent a finding of good faith on behalf of each settling defendant which contributed to the settlement fund to satisfy each plaintiff's claim.

---

**4.** Non-settling defendants contend that a 65%/35% sharing arrangement between Kemper and the PLC with respect to certain "Group C" defendants is contrary to public policy embodied by the statute of limitations. This issue is now moot because that provision was deleted by the parties before decision of this matter. Second Supplemental Agreement Between Kemper and PLC, ¶ I.

## VI.  CONCLUSION

The MGM fire was the second largest life-loss hotel fire in the history of the United States.  The devastation resulting from the fire caused damages in the millions.  Plaintiffs and defendants have entered into a series of settlements within three years of the date of the fire to end almost all of the litigation with respect to the fire.  This settlement will result in immediate compensation to the victims and result in substantial savings to all defendants in terms of litigation costs which in this complex case could result in ultimate devastation to many of the defendants involved.  By reason of N.R.S. 17.245, non-settling defendants are fully protected by reason that the settlements will be fully credited from any subsequent verdicts at the time of trial and their decisions to settle or not to settle and to proceed to trial by jury, which is their constitutional right, has by no means been impaired.[5]

An accompanying Order will be entered.

## ORDER

AND NOW, TO WIT, this 12th day of July, 1983, for the reasons stated in the foregoing Memorandum, IT IS ORDERED as follows:

1.  The Motion of Cadillac Plastic and Chemical Company Suggesting that the Honorable Lewis C. Bechtle [sic] should Disqualify Himself from Assessing or Determining the Good Faith of the Proposed Settlements, or, in the Alternative, that He Appoint a Special Master to Assess or Determine the Issue is *denied;*

2.  The Motion of Cadillac Plastic and Chemical Company for Reconsideration and Review is *denied;*

3.  The Motion of Cadillac Plastic and Chemical Company to Strike Evidence and Exhibits is *denied;*

4.  The Motion for Receipt into Evidence of Second Supplemental Agreement Between Kemper and PLC to Contract for Common Plan of Litigation in Connection with Good Faith Hearing is *granted* and the Second Supplemental Agreement is *admitted* as part of the record;

5.  The Joint Motion for Approval of Settlements by the following defendants:

Advance Mechanical, Inc.
Air Balance Company, Inc.
Alarmco, Inc.
Albert Van Luit & Co., Inc.
Alflex Corporation (third-party defendant of Graybar Electric Supply, Inc.)
Bally Distributing Company
California Electric Construction Company
Clark County, subdivision of the State of Nevada
Clark County Fire Protection District, subdivision of the State of Nevada
Continental Mechanical Corp.
C.W. Stockwell, Inc.
Dash Industries, Inc., formerly known as David & Dash
Delta T
Dynaelectric of Nevada, Inc.
Familian Corp.
General Felt Industries, Inc.
General Felt Products of California, Inc.
Martin Stern, individually;  Joel Bergman, individually;  Martin Stern A.I.A. Architects and Associates, Inc., a California corporation;  Martin Stern A.I.A. Architect and Associates, Inc., a Nevada corporation
MGM Grand Hotels, Inc. and MGM Grand Hotel Las Vegas, Inc. and all persons and entities listed or described in para-

---

**5.**  The Court has reviewed the motion of Cadillac Plastic and Chemical Company to strike evidence and exhibits and finds it to be without merit.  The Court has also reviewed the motion of Cadillac Plastic for reconsideration and review and finds that motion to be without merit because non-settling defendants had been furnished all settlement agreements prior to the hearing, affidavits had been filed by all counsel in support of each of the settlement agree-ments, John Cummings, Esquire, Co-Chairman of the PLC, testified at the hearing and was subjected to cross-examination, Thomas H. Foulds, Esquire, counsel for Kemper, testified at the hearing and was subjected to cross-examination, and defendant Cadillac Plastic waived any rights to further discovery by failing to specifically state the discovery items sought as expressed by the Court at the hearing on June 6 and 7, 1983.

938

graph 11 of the Settlement Stipulation dated January 3, 1983

Miles R. Nay, Inc.

Nay Mechanical, Inc.

Northrop Architectural Systems and Northrop Corporation

N.W.S. Construction Corp., Inc.

Orvin Engineering Corporation

Otis Elevator Company

United Technologies Corporation

Precisionaire, Inc., successor in interest to B & M Air Balance

B & M Air Balance

QRS Neon Corporation

Ralph E. Phillips, Inc.

Ram Products Company

Richard A. Hunter and Margaret Hunter, individually and d/b/a RAH Construction Co.

Richard S. Hatfield, Inc., d/b/a Norm's Refrigeration and Ice Equipment

Roberts Electric

Simpson Timber Company

Southwest Air Conditioning, Inc.

Standard Cabinet Works, Inc.

Taylor Construction Company

Taylor International Corporation

Taylor of Nevada, Inc.

Mason Corporation

Stuart J. Mason

Morry M. Mason

Temtrol, Inc.

Governaire Corporation

Thorpe Insulation

Wall-Pride, Inc.

W.A. Perry Tile and Marble Company

Winfield Design Associates, Inc.

W.J. Thompson, Inc.

Wilkinson Company, Inc., d/b/a Wilkinson Chutes, Inc.

H.H. Robertson Corporation

SMB Corporation

American Protection Insurance Co., a subsidiary of American Motorists Insurance Co.

American Motorists Insurance Co., a subsidiary of Kemper Corporation

Kemper Corporation, a subsidiary of Lumbermens Mutual Casualty Co.

Lumbermens Mutual Casualty Co., d/b/a Kemper Group, Kemper Insurance Group, Kemper Insurance and Kemper Insurance Companies

is *granted* and the Court *approves* each of the aforementioned settling defendant's Settlement Agreements with the Plaintiffs' Legal Committee ("PLC") as fair, just and reasonable and as having been entered into by the parties thereto in good faith under N.R.S. 17.245.